PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

No. 10-4478

WALTER LLOYD BLAIR,

       *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:08-cr-00505-PJM-1)

Argued: March 25, 2011

Decided: September 21, 2011

Before TRAXLER, Chief Judge, and WILKINSON and
WYNN, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published
per curiam opinion as to Sections I, II, and III. Judge Wilkinson wrote the majority opinion as to Section IV, in which
Judge Wynn joined. Chief Judge Traxler wrote a dissenting
opinion as to Section IV.

## COUNSEL

**ARGUED:** Eric Hans Kirchman, KIRCHMAN & KIRCH-
MAN, Washington, D.C., for Appellant. Michael Richard

Pauze, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Kenneth M. Robinson, Washington, D.C., for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Jonathan C. Su, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

## OPINION

PER CURIAM:

Walter L. Blair, a Maryland attorney, concocted and executed a scheme to launder drug proceeds that he obtained from a client. Blair was tried and convicted on eight counts of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); one count of laundering in violation of 18 U.S.C. § 1957(a); one count of tampering with a witness in violation of 18 U.S.C. § 1512; one count of obstructing justice in violation of 18 U.S.C. § 1503(a); one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2); and two counts of failing to file an income tax return in violation of 26 U.S.C. § 7203.[1] He received a 97-month sentence. Blair appeals several counts of conviction for money laundering as well as his obstruction of justice conviction. Blair also challenges the ruling of the district court denying his motion to sever the failure-to-file counts. We affirm the convictions for money laundering under §§ 1956 and 1957, and we affirm the district court's denial of Blair's motion to sever. We reverse, however, Blair's conviction on the obstruction-of-justice charge (Count 11 of the superseding indictment) for insufficient evidence. We remand for resentencing in light of this opinion.

---

[1]Blair was also charged with a forfeiture count through which the government sought to forfeit certain real property in which Blair had an interest. *See* 18 U.S.C. § 982.

I.

In 2003, Anthony Rankine operated a large marijuana distribution ring near Richmond, Virginia, with numerous associates who, like Rankine, were originally from Jamaica. About twice per month, Rankine received 500-pound crates of marijuana from his suppliers on the west coast. Rankine paid for the marijuana with cash that was rubber-banded in $1,000 stacks. Members of the operation also used this packaging method for storing business proceeds and paying each other for supplies.

Elizabeth Nicely Simpson ("Nicely") was a Maryland resident who was employed at a retirement home in Germantown, Maryland. In August 2003, Nicely's sister, Janet, asked her to purchase a Cadillac Escalade for Rankine. Rankine supplied an $18,000 down payment, and Nicely financed the remaining amount in her own name based on Rankine's promise to supply the funds to pay off the loan. Although the vehicle was registered and titled in Nicely's name, Rankine used it as his own. Shortly after Nicely helped Rankine obtain the Escalade, Janet requested that Nicely perform another favor for Rankine —that she store a safe belonging to Rankine at her house. Even though Nicely understood that Rankine earned a living as a drug dealer, she agreed to keep the safe. Rankine brought the safe to Nicely's house but did not leave her a key or the combination to the safe.

In the fall of 2003, Rankine's girlfriend, Tasha Robinson, was murdered and found in his Richmond home. Initially, Rankine was missing, along with Tasha's son. The case garnered substantial media coverage as a manhunt was conducted. (Rankine and, tragically, the boy, were murdered and found in the subsequent weeks). According to Nicely, it was around the time of these events that she became aware that the safe contained drug money and realized she could be in danger. Nicely therefore moved the safe from her home to a storage facility.

It was also during this time that Nicely began receiving phone calls from Rankine's associates. Dashawn Saunders, a member of Rankine's organization, contacted her and indicated he wanted to take possession of Rankine's Escalade, which was being held by an automotive rim and tire shop in Richmond. Nicely gave Saunders written permission to take the Escalade from the premises of the auto shop. Saunders was accompanied by Shannon Bell, a marijuana dealer who used Rankine and Saunders as his suppliers. When they arrived to retrieve the vehicle, however, police arrested them on drug trafficking charges. The Escalade contained $42,000 in drug proceeds that Bell had given Saunders earlier. When Nicely began receiving threats and phone calls about the money in her possession, she became frightened and confided in co-worker Michael Henry that she was holding a safe containing drug money that belonged to Rankine. Henry advised Nicely to contact a criminal defense attorney, and Nicely agreed. They were referred to Blair, a local attorney in Maryland. Like Rankine and his associates, Nicely, Henry and Blair were all native Jamaicans.

On November 4, 2003, Nicely called Blair. Over the phone, Nicely explained to him that she was holding a safe containing drug money belonging to Rankine, that Rankine was missing and that Tasha Robinson had been murdered. Blair cautioned her that the phone might not be secure and asked her not to say anything else. Blair requested instead that Nicely come to his office for a face-to-face appointment later that day.

During her initial meeting with Blair, which Henry also attended, Nicely repeated that she had a safe containing drug proceeds belonging to Rankine and that she was frightened in light of the violence linked to Rankine. To emphasize her point, Nicely showed Blair internet media coverage linking Tasha's murder and Rankine's disappearance to a large "Jamaican drug ring." J.A. 170. Nicely also expressed concern about the phone calls she had been getting. Specifically,

Nicely told Blair that she received a phone call from someone who indicated that Saunders was incarcerated in Richmond and "need[ed] that drug money" for his legal defense. Nicely was also worried about being tied to the Escalade.

Blair advised Nicely and Henry to open the safe by any means necessary, retrieve the contents and bring them back to Blair. The following day, Nicely contacted the manufacturer of the safe, the Sentry Group, and obtained a key. Nicely and Henry dumped the contents of the safe—stacks of cash secured by rubber bands—into a duffle bag without counting it.

On November 6, 2003, Nicely and Henry took the duffle bag of cash to Blair's office as Blair had instructed them. Henry gave the duffle bag to Blair, who then asked Nicely to leave the room to "protect" her, while he and Henry counted the money. J.A. 175. Henry watched Blair count approximately $170,000 from the duffle bag. When they reconvened with Nicely, however, Blair told her there was only about $70,000 in the bag.

After counting the cash from Rankine's safe, Blair suggested that they take several steps. First, Blair gave Nicely and Henry a cover story to explain the cash. Blair told them that if anyone asked, they should say that it was "partner money." J.A. 176. "Partner money" is a familiar concept in Jamaican culture, and both Nicely and Henry understood the term when Blair used it. Essentially, a "partner" arrangement is an asset-pooling arrangement that allows people of modest means to obtain substantial funds that would not be available to them through a lending institution. The "partners" agree to contribute a given amount to the pool on a regular basis; the money is held and administered by a person known as the "banker." The banker then distributes the pool to one partner, and each partner successively receives a "draw" until all of the partners have received their draw. Blair instructed Nicely to say that Tasha, Rankine's deceased girlfriend, was the

banker. Blair explained that calling Tasha the banker was particularly effective "since she was the banker who ha[d] everyone's information, [but] she's dead so nobody would know." J.A. 185.

Next, Blair announced that he intended to set up a real estate corporation for Nicely—although she never asked him to do so—through which she could use some of the money to buy properties. Blair asked Nicely to pick a name for the company, and she selected her son's name, "Jay Paul." William Payne, an attorney in Blair's firm, prepared the Articles of Incorporation for "Jay Paul Property Management," and listed both Nicely and Henry as officers. Blair then presented Nicely with a "Retainer and Fee Agreement," on which Blair instructed her to write "This is a retainer to establish my corporation [for] the purpose of buying and selling real estate in the DC metro area." J.A. 673. Blair further instructed Nicely to write "I also authorize and retain Blair & Lee to recover my vehicle or [t]ake appropriate action to protect my interest." *Id.* Additionally, Nicely, pursuant to Blair's instructions, wrote "Initial deposit for new bank account $7,000.00." J.A. 674.

Finally, Blair told Nicely and Henry that they needed to set aside money to cover the legal fees of two of Rankine's associates who had been arrested on drug charges in Richmond—Saunders and Richard Bernard. Also, Blair indicated they should set aside cash to find and recover the Escalade.

Blair then took Nicely and Henry to meet a mortgage broker, Vassel Clarke, who Blair asked to find and purchase real estate on behalf of Nicely. Blair brought the duffle bag of cash to the meeting and told Clarke that the large amount of cash was "partner money." Like Nicely and Henry, Clarke had ties to Jamaica and was familiar with the concept of a "partner" arrangement, although he had never seen a draw involving such a large amount of money. Blair initially asked Clarke to take the entire amount—which Blair told Clarke was $100,000—to invest, but Clark refused. Instead, Clarke

took $9,000 in cash; Blair retained the rest and maintained control of the drug money from that point forward.

Blair then contacted Virginia Attorneys David Boone and James Yoffy in an effort to secure representation for Rankine associates Saunders and Bernard on federal drug conspiracy charges in Richmond. Boone agreed to represent Saunders as co-counsel with Blair, and Yoffy agreed to represent Bernard. Blair used cash from the duffle bag to purchase one $10,000 SunTrust cashier's check for each lawyer. Blair retained $10,000 himself as co-counsel for Saunders.

On November 7, 2003, Nicely opened up two new bank accounts. Accompanied by Clarke, Nicely first opened an individual checking account in her name at a branch of BB&T. They deposited the $9,000 cash that Blair had given Clarke from the duffle bag. Nicely then met with Blair and attempted to open a business account at SunTrust Bank in the name Jay Paul Property Management; however, Blair was unable to open an account because Nicely's new corporation did not have a tax identification number. Instead, Blair opened a SunTrust account in the name of his law firm, calling the account "Blair & Associates, LLC, for Jay Paul Property Management." J.A. 609. Although the purported retainer agreement indicated that Nicely intended the "[i]nitial deposit for new bank account [to be] $7,000.00," Blair deposited $6,000 cash and claimed $1,000 for himself for Payne's legal services in setting up the corporation.

A few days later, Blair gave Clarke an additional $31,000 in cash to use in purchasing real estate for Nicely. Heeding Blair's warning not to deposit it all at once, Clarke made a series of cash deposits into Nicely's BB&T account. Then, Clarke found two properties for Nicely to purchase. First, Nicely purchased a house in Washington, D.C., using the BB&T account to write a $2,000 check for the earnest money deposit and then to purchase a bank check for $12,432, which was the amount due at closing. Second, Clarke found some

land in Maryland for Nicely to purchase. Nicely paid a deposit on the Maryland property with a $5,000 check from the BB&T account.

On November 12, 2003, FBI agents contacted Nicely and indicated they wished to interview her about the Escalade, which had been tied to the drug-trafficking case in Richmond. Nicely refused to answer questions, however, and referred the agents to Blair. Nicely then went to Blair's office to discuss how she should handle questions from the FBI. Blair instructed Nicely not to tell agents about the money from the safe and to talk only about the Escalade. Blair told Nicely that if the subject of the money were to arise, she should explain that it was "partner money." During the meeting, Blair tape recorded Nicely rehearsing what she would say to the FBI agents.

On November 13, 2003, Blair gave Nicely a letter that she was supposed to memorize. Although the letter purported to be an "opinion letter," it set forth the details of the "partner money" story:

> It appears that over the past year or two you have collected $77,000.00. This money has been delivered to you from several people pursuant to the legitimate financial arrangement known throughout the Caribbean community and particularly the Jamaican community as "PARTNER."

> You have advised that this money is all legitimate and submitted by persons who have lawful employment and none of such money was generated by drug deals or any illegal activities. You were the next person to receive a draw scheduled to occur in January 2004. Your plan with said $77,000.00 . . . was to purchase rental property . . . .

> Ms. Tasha Robinson was also a person who put money in the partnership pot and she was the admin-

istrator of the partners. She kept all the names and records of monies received and persons making contributions. Ms. Robinson died during the month of October, 2003.

J.A. 692-93 (footnote omitted).

The letter also suggested an explanation for Nicely's involvement in paying legal fees for Saunders and Bernard:

Prior to meeting with me on November 4, 2003, two of your family members (Messrs. Richard [Bernard] and Dashawn Saunders) were allegedly charged with criminal conduct in Richmond, Virginia. . . . Both of these persons were in need of attorneys. You requested my assistance with respect to such legal services for these men.

As you know, I have joined with Attorney David Boone, an excellent attorney in Richmond, Virginia, as co-counsel, and we are now representing Dashawn Saunders. Another attorney, Mr. James Yoffy, is now representing Mr. Richard Bernard. The total attorney's fees you have paid to the three attorneys mentioned, thus far for the representation of these two men, is $30,000.00. . . . You advised that the $30,000.00 is a loan to Mr. Saunders and Mr. Bernard and you hope to receive monies back from them in the future.

J.A. 693. Nicely was not actually related to either Saunders or Bernard.

The letter also provided an accounting of the alleged $77,000.00 partner draw, less $30,000 for legal fees. Blair wrote that $40,000 was "transferred to a realtor for the purchase of a rental property" and that the remaining $7,000

"was delivered to me by you to establish your corporate matters and to provide whatever legal services you may need." *Id.*

On November 17, 2003, Blair, as Saunders' ostensible co-counsel, sought admission *pro hac vice* to represent Saunders in the United States District Court for the Eastern District of Virginia in the matter of *United States v. Dashawn Andre Saunders*, case number 3:03-cr-420. In his application, Blair represented to the district court that he had never been reprimanded by any court or subject to any disciplinary action by any bar association. As it turned out, however, not only had Blair been previously reprimanded, but he had his license suspended for a definite period by the West Virginia Supreme Court of Appeals for witness tampering. Blair's application was granted nonetheless, and Blair continued, along with Boone, as counsel of record for Saunders until July 2004, when Saunders was sentenced after pleading guilty.[2] Blair never made an appearance in court; Boone, however, kept Blair apprised of the status of the case.

Based on this and other evidence presented at trial, Blair was convicted on each count in the indictment. On appeal, Blair challenges the sufficiency of the evidence to support his convictions on four of the § 1956 money laundering counts and the obstruction of justice count. Blair also challenges the district court's denial of his motion to sever the two failure to file counts and his motion to dismiss the § 1957 money laundering count. We discuss each challenge below.

II.

Blair challenges the sufficiency of the evidence to sustain

---

[2]Bernard was originally charged in the drug distribution conspiracy; charges were later added alleging that it was Bernard who murdered Rankine, Tasha and Tasha's son. In October 2004, Bernard pled guilty to murder during a conspiracy to distribute drugs. *See United States v. Richard Dwight Bernard*, No. 3:03-cr-0420.

his convictions on several counts of the indictment. The jury's verdict "must be upheld on appeal if there is substantial evidence in the record to support it." *United States v. Foster*, 507 F.3d 233, 244 (4th Cir. 2007). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). Our review of a sufficiency challenge is very deferential, limited to determining whether, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, . . . the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." *Id.* at 863 (internal quotation marks omitted).

## A.

Blair first challenges the sufficiency of the evidence to support the jury's guilty verdict on Count 1 charging that Blair violated 18 U.S.C. § 1956(a)(1)(B)(i) by laundering more than $70,000 in drug proceeds given to him by Elizabeth Nicely on November 6, 2003. Because our review of the record convinces us that the evidence was sufficient, we reject this argument.

"In the common understanding, money laundering occurs when money derived from criminal activity is placed into a legitimate business in an effort to cleanse the money of criminal taint." *United States v. Bolden*, 325 F.3d 471, 486 (4th Cir. 2003). The money laundering statute proscribes several distinct types of money laundering, *see id.*, including the type alleged in this case—"concealment" money laundering, *see* 18 U.S.C. § 1956(a)(1)(B)(i). The pertinent portion of the statute provides:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or

attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

. . .

> (B) knowing that the transaction is designed in whole or in part—

> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;

> . . .

shall [be subject to criminal punishment] . . .

18 U.S.C. § 1956(a)(1)(B)(i).

In order to sustain a conviction under this provision, the government must prove that: (1) the defendant conducted a financial transaction affecting interstate commerce; (2) "the transaction involved the proceeds of specified unlawful activity"; (3) the defendant knew that the property involved was derived from unlawful activity; and (4) "the defendant knew that the transaction was designed in whole or part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity." *United States v. Wilkinson*, 137 F.3d 214, 221 (4th Cir. 1998).

On appeal, Blair argues that the evidence failed to show that his mere receipt of the drug proceeds from Henry and Nicely constituted a financial transaction designed to conceal the nature, source, location or ownership of the money. We disagree. The evidence clearly was sufficient to allow a reasonable jury to conclude that Blair received the money knowing full well that he did so for the purpose of laundering it.

Blair's initial receipt of the drug proceeds from Nicely was just the first step in his own plan to launder the money.

First, the evidence was sufficient to show that Blair "conduct[ed] . . . a financial transaction" for purposes of 18 U.S.C. § 1956(a)(1). The statute defines "transaction" broadly to include a "transfer, delivery, or other disposition." 18 U.S.C. § 1956(c)(3). In turn, a "financial transaction" under § 1956 means, among other things, "a transaction . . . involving the movement of funds by wire or other means." 18 U.S.C. § 1956(c)(4). Almost any exchange of money between two parties qualifies as a financial transaction subject to criminal prosecution under § 1956, provided that the transaction has at least a minimal effect on interstate commerce and satisfies at least one of the four intent requirements of § 1956(a)(1)(A)-(B). Thus, even the mere receipt of funds can constitute a transaction subject to criminal prosecution under § 1956. *See United States v. Gotti*, 459 F.3d 296, 335-36 (2d Cir. 2006).

Second, the intent requirement is supported by the evidence as well. Blair took the proceeds well aware that the transaction was the first step in his plan to conceal the nature, the location, the source, the ownership, and the control of the drug proceeds. Indeed, Blair directed Nicely and Henry to bring him the drug money in the first instance. By the time Nicely returned with the money from the safe, Blair had already devised the cover story for the money—that it was all partner money—as well as a plan to launder the money through a sham real estate company. Accordingly, we conclude there was sufficient evidence to support the jury's guilty verdict on Count 1.

## B.

Blair next contends that the evidence was insufficient to support the jury's verdict on Counts 5, 6, and 8 of the indictment, each of which charged Blair with aiding and abetting Nicely in conducting a money laundering transaction in viola-

tion of 18 U.S.C. § 1956(a)(1)(B)(i). Each of the subject transactions was based on a check drawn by Nicely on her BB&T account: a November 22, 2003, BB&T check for $2,000 payable to the seller of the Washington, D.C. property that Clarke found for her (Count 5); a November 28, 2003, BB&T check for $5,000 payable to the owner of the Maryland property Clarke located for her (Count 6); and a January 8, 2004, BB&T cashier's check for $12,432.31 purchased with funds transferred from Nicely's BB&T account for the balance due at the closing of the Washington, D.C. property (Count 8).

Blair does not challenge his liability as an aider and abettor of the money laundering activity charged in Counts 5, 6, and 8. Rather, relying on the rule that to secure a conviction for aiding and abetting, the government must "show[ ] that the underlying crime was committed by someone," *United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990) (internal quotation marks omitted), Blair contends that Nicely's conduct did not constitute money laundering in the first place. Specifically, Blair argues that the concealment money laundering occurred, if at all, when Nicely and Clarke deposited money into the BB&T account, not when money was withdrawn. Blair reasons that "there was no need to conceal anything as the concealment had occurred when the cash was deposited" and that "[w]hat was done with the money after it was deposited into the BB&T Bank account was simply spending money that had already been laundered." Brief of Appellant at 39.

We disagree. The withdrawal of funds from an account qualifies as a "transaction" for purposes of the money laundering statute, which explicitly includes "deposit[s]" and "withdrawal[s]" within the definition of "transaction." 18 U.S.C. § 1956(c)(3). Thus, "a deposit of money in a bank and the subsequent use of that money to purchase [real estate] are two transactions within the scope of the [money laundering] statute." *United States v. Blackman*, 904 F.2d 1250, 1257 (8th

Cir. 1990). If Blair were correct that only the deposit of funds could constitute money laundering, then the reference in the statute to "withdrawal" would be superfluous.

In our view, the evidence clearly permitted reasonable jurors to infer that the transactions alleged in Counts 5, 6, and 8 were designed to conceal the nature, location and source of the drug proceeds that had been deposited into the BB&T account. Each of these transactions was conducted in furtherance of Blair's scheme to legitimize the tainted proceeds by putting them into real estate. We reject Blair's narrow interpretation of "transaction" as used in § 1956(c)(3) and affirm these convictions.

## C.

Finally, Blair challenges the sufficiency of the evidence to support his conviction on Count 11 for obstruction of justice under 18 U.S.C. § 1503(a), contending that the evidence fails to support a finding that he intended to obstruct or impede a pending judicial proceeding. In relevant part, the obstruction of justice statute provides:

> Whoever . . . corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

18 U.S.C. § 1503(a). To establish obstruction of justice under this provision, the government must prove: (1) the existence of a "pending judicial proceeding"; (2) that the defendant had knowledge of the pending proceeding; and (3) that the defendant acted "with the intent to influence, obstruct, or impede that proceeding in its due administration of justice." *United States v. Grubb*, 11 F.3d 426, 437 (4th Cir. 1993). The Supreme Court has instructed that under § 1503, the government is not required to demonstrate that justice was actually obstructed; rather, the prosecution must prove only that "the

endeavor [has] the natural and probable effect of interfering with the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (internal quotation marks omitted). In this vein, we have explained that "[b]ecause evidence of intent will almost always be circumstantial, . . . a defendant may be found culpable where the reasonable and foreseeable consequences of his acts are the obstruction of justice." *United States v. Brooks*, 111 F.3d 365, 372 (4th Cir. 1997); *see United States v. Neiswender*, 590 F.2d 1269, 1273 (4th Cir. 1979) (explaining that to be culpable under § 1503, a defendant "need only have had knowledge or notice that success in his fraud would have likely resulted in an obstruction of justice").

The evidence adduced at trial, viewed in a light most favorable to the government, showed that Blair took possession of $170,000 that he knew to be drug proceeds from a drug distribution ring with which Saunders and Bernard were associated and that Blair created a cover story and real estate investment scheme to conceal the source and true nature of the money. In one of their first consultations, Blair also advised Nicely to use some of the proceeds to secure legal representation for Saunders and Bernard on federal drug conspiracy charges in Richmond.

Blair soon followed up in a purported "opinion letter" that created a cover story to explain why Nicely would provide the financial means for two members of Rankine's drug organization to obtain legal counsel:

> Prior to meeting with me on November 4, 2003, two of your family members (Messrs. Richard [Bernard] and Dashawn Saunders) were allegedly charged with criminal conduct in Richmond, Virginia. . . . Both of these persons were in need of attorneys. You requested my assistance with respect to such legal services for these men.

> As you know, I have joined with Attorney David Boone, an excellent attorney in Richmond, Virginia, as co-counsel, and we are now representing Dashawn Saunders. Another attorney . . . is now representing Mr. Richard Bernard. The total attorney's fees you have paid to the three attorneys mentioned, thus far for the representation of these two men, is $30,000.00. . . . [T]he $30,000 is a loan to Mr. Saunders and Mr. Bernard and you hope to receive monies back from them in the future.

J.A. 693. Thus, Blair intended to serve as co-counsel with Boone in representing Saunders at the trial of various members of the drug organization that generated the funds Blair was laundering.

Since Blair was not admitted to practice in Virginia federal court, he filed a motion for admission pro hac vice to the Eastern District of Virginia. In the application, Blair indicated he had "not been reprimanded in any court nor ha[d] there been any action in any court pertaining to [his] conduct or fitness as a member of the bar." J.A. 714. As it turned out, the Supreme Court of Appeals of West Virginia had reprimanded Blair in 1984 for witness tampering and suspended his license for 6 months. J.A. 476-77. Unaware of this at the time, however, the district court granted Blair pro hac vice admission.

Blair argues the evidence is insufficient because a false statement without more does not support an obstruction conviction. As a general rule, this is true. *See Grubb*, 11 F.3d at 437 (explaining that "an obstruction of justice prosecution cannot rest solely on the allegation or proof of perjury"). "[W]hat also must additionally be proven is that the false statements given, in some way, either obstructed or were intended to obstruct the due administration of justice." *Id.* (footnote omitted).

In response, the government reiterates that it only had to prove that "the reasonable and foreseeable consequences of

his acts"—the misrepresentations to the court about Blair's previous professional discipline—"are the obstruction of justice." *Brooks*, 111 F.3d at 372. The government's theory was that Blair wanted to be involved as counsel to keep close tabs on the prosecution of the drug ring, which could have potentially implicated Blair since he was laundering the proceeds. Critically, the government argues that Blair obtained his pro hac vice admission through fraud, "a foreseeable consequence of which was jeopardizing the criminal prosecution" by creating for Saunders "a persuasive ineffective assistance of counsel claim [based on] a serious conflict of interest stemming from [Blair's] own criminal exposure." Brief of Appellee at 29. The government argues further that the conflict of interest particularly compromised Blair's ability to advise Saunders on the benefits of cooperating with authorities since such a course might leave Blair exposed to criminal liability.

It is a close question, but we cannot conclude that the jury, *on the record before us*, could draw the conclusions suggested by the government. Although it is not difficult to imagine how the administration of justice might be impeded by the participation of Blair, an attorney hampered by a serious conflict of interest with his client, Blair was specifically charged with obstructing justice by making a false statement to the court about his professional background and standing with the bar. The government, therefore, was required to "establish a nexus between the *false statement*[ ] and the obstruction of the administration of justice"; in other words, the government must prove that Blair's false representations "had the natural and probable effect of impeding justice." *United States v. Thomas*, 916 F.2d 647, 652 (11th Cir. 1990) (emphasis added). We simply do not find such evidence in the record and conclude that the government's arguments rest on mere speculation. Without some evidence explaining ineffective assistance claims on collateral review, the jury could not reasonably find that such claims were a foreseeable and natural consequence of Blair's fraudulent statement to the district court.

In sum, we conclude there is sufficient evidence to sustain Blair's money laundering convictions on Counts 1, 5, 6, and 8. On the other hand, we conclude there is insufficient evidence to sustain Blair's conviction for obstruction of justice on Count 11, and so we reverse that conviction.

## III.

Based on information gleaned during the investigation of the drug ring and money laundering activity, Blair was charged with two counts of failing to file income tax returns for the years 2002 and 2003. Specifically, the indictment charged that Blair received gross income substantially in excess of that needed to trigger the filing requirement, that Blair had requested an extension of time in which to file, but that he had never filed his 2002 and 2003 returns. Blair filed a pre-trial motion to sever the two failure-to-file charges, which the district court denied. On appeal, Blair contends (1) that the two tax counts were improperly joined to the other counts in the indictment under Rule 8(a) of the Federal Rules of Criminal Procedure and (2) that even if there was no misjoinder, the tax counts should have been severed under Rule 14.

Although the joinder rules are related, we apply a different standard of review to each rule. The question of "[w]hether offenses in an indictment are improperly joined under Rule 8(a) is a question of law reviewed de novo." *United States v. Cardwell*, 433 F.3d 378, 384-85 (4th Cir. 2005). If it turns out that joinder was improper, we must conduct a harmlessness review where reversal is required "*only* if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Hawkins*, 589 F.3d 694, 704 (4th Cir. 2009) (internal quotation marks omitted). If, on the other hand, initial joinder under Rule 8(a) was permissible, then the defendant's only recourse is to convince the court that the charges should be severed under Rule 14—a difficult task. *See Car-*

*dwell*, 433 F.3d at 387 ("This rule contemplates that joinder under Rule 8(a) can be proper and, at the same time, severance can be required. Such cases, however, will be rare."). Under Rule 14, a properly joined claim may be severed "*only* if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Id.* (internal quotation marks omitted). We review the district court's refusal to sever a properly joined count under Rule 14 for abuse of discretion. *See id.* at 385.

### A.   Joinder

First, Blair argues that the tax counts were not properly joined under Rule 8(a) because they were not connected to the money laundering scheme. In particular, Blair objects to the joinder of the charge alleging that he failed to file a 2002 tax return in view of the fact that he did not even meet Nicely until November 2003. Thus, Blair contends, the drug proceeds he obtained from Nicely and the subsequent laundering scheme were not connected in any way to his 2002 tax obligations.

Rule 8(a) of the Federal Rules of Criminal Procedure permits the government to "charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." To promote judicial efficiency, Rule 8(a) "permits very broad joinder" of "related counts in the same trial." *Cardwell*, 433 F.3d at 385 (alterations and internal quotation marks omitted). As we have noted, "the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses should be tried in a single proceeding." *Hawkins*, 589 F.3d at 700 (internal quotation marks omitted).

The government contends the tax counts were connected with or constituted part of a common scheme to which the

other offenses charged in the indictment were connected. In determining whether two offenses are connected with or constitute parts of a common scheme or plan for purposes of Rule 8(a), we have read the rule "flexibly" to require simply a "logical relationship" between offenses charged in the indictment. *Cardwell*, 433 F.3d at 385 (internal quotation marks omitted). With respect to the charge that Blair failed to file a tax return in 2003, the government's position is most certainly correct. The evidence established that in 2003, Blair likely stole at least $100,000 in drug proceeds—substantial unreported income. We conclude that "a tax count is properly joined to other counts of an indictment if the other crimes generated the income on which the defendant evaded payment." *United States v. Oakey*, 853 F.2d 551, 554 (7th Cir. 1988). Here, there is an obvious connection between Blair's failure to file a 2003 tax return and the rest of the indictment. Joinder of Count 14 was therefore proper under Rule 8(a).

It is less clear whether Count 13, alleging that Blair failed to file a 2002 tax return, was properly joined. The unreported income that triggered Blair's obligation to file did not flow from the money laundering activities that commenced in 2003. Assuming that Count 13 was not properly joined under Rule 8(a), however, we nevertheless perceive no reversible error.

"An error involving misjoinder affects substantial rights and requires reversal *only* if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Hawkins*, 589 F.3d at 704 (internal quotation marks omitted). In considering whether actual prejudice flowed from the improper joinder, we are aided by certain "indicia of harmlessness":

> (1) whether the evidence of guilt was overwhelming and the concomitant effect of any improperly admitted evidence on the jury's verdict; (2) the steps taken to mitigate the effects of the error; and (3) the extent

> to which the improperly admitted evidence as to the misjoined counts would have been admissible at trial on the other counts.

*Id.* (quoting *United States v. Mackins*, 315 F.3d 399, 414 (4th Cir. 2003)). Here, the evidence was overwhelming on all of the charges against Blair except for the obstruction offense. Moreover, there is no indication that evidence with respect to Blair's failure to file his 2002 tax returns substantially influenced the jury's verdicts on the other counts. Such evidence was "distinct and easily segregated from the evidence related to the heart of the case" against Blair; there was little chance that evidence relating to the misjoined count would have a prejudicial spillover effect on the other counts in the indictment. *United States v. Mackins*, 315 F.3d 399, 415 (4th Cir. 2003) (internal quotation marks omitted). Further limiting any chance of an improper spillover effect in this case was the cautionary instruction issued by the district court to the jury:

> Each count charges the defendant with a different crime and you have to consider each count separately and return a separate verdict of guilty or not guilty for each. And whether you find the defendant guilty or not guilty as to one offense should not affect your verdict with regard to any other offense charged.

S.J.A. 1. We have previously considered the effect of a jury instruction containing virtually identical language, concluding that it substantially "mitigate[d] . . . any possible spillover of prejudicial evidence." *Mackins*, 315 F.3d at 415 (internal quotation marks omitted); *see United States v. LaRouche*, 896 F.2d 815, 831 (4th Cir. 1990) ("We have . . . made clear that curative instructions given to the jury by the district court go a long way in eliminating any prejudice resulting from the spillover effects of joinder.")

Accordingly, we conclude that Count 14 was properly joined under Rule 8(a) and that the joinder of Count 13, assuming it was improper under Rule 8(a), was harmless.

## B. Severance

Blair asserts that even if the tax counts were properly joined under Rule 8(a), the district court abused its discretion in failing to sever them under Rule 14. Rule 14 provides that "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). To show entitlement to severance, the defendant "must establish that actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (citation, alteration, and internal quotation marks omitted). To successfully challenge the district court's refusal to sever under Rule 14(a), Blair faces the daunting task of demonstrating that there was "a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "[R]eversal under Rule 14 is required only if the defendant shows that requiring him to defend against the joined offenses in the same trial resulted in clear prejudice." *Cardwell*, 433 F.3d at 387-88 (internal quotation marks omitted).

Blair contends that even if Count 14 was properly joined, he was severely prejudiced by the evidence relating to that claim. Specifically, Blair objects to evidence the government presented that Blair had tax returns prepared for 2003 which he submitted as part of a loan application but did not file with the IRS. Blair contends this evidence was prejudicial because it was offered merely to demonstrate his disposition to engage in dishonest criminal conduct to serve his own ends.

We disagree for the same reasons that support our conclusion that any misjoinder of Count 13 was harmless. The government presented overwhelming evidence of Blair's guilt on the money laundering charges, evidence supporting the charge that Blair failed to file a 2003 tax return was "easily segregated" from the central focus of the indictment on the money laundering scheme, and the district court issued a mitigating instruction. We conclude that Blair has failed to surmount the "clear prejudice" hurdle imposed by Rule 14 and that the district court did not abuse his discretion in denying the motion to sever.

WILKINSON, Circuit Judge, writing an opinion for the court as to Part IV, in which Judge WYNN joins:

IV.

Finally, Blair challenges the district court's denial of his motion to dismiss Count 9 of his indictment. Some factual background is in order. A jury convicted Blair under 18 U.S.C. § 1957, which prohibits knowingly engaging in a monetary transaction with criminally derived property of a value greater than $10,000. Blair's conviction was based on his use of the proceeds of an illegal drug enterprise to purchase two cashier's checks for $10,000 dollars each, a monetary transaction clearly prohibited by the statute. Blair then used these checks to secure counsel for DaShawn Saunders and Richard Bernard, two associates of Anthony Rankine. He also took nearly $10,000 in drug proceeds for himself, purportedly as his fee for being Saunders's co-counsel.

Blair argues that § 1957(f)(1) shields him from prosecution because he used the drug proceeds to secure legal representation for others involved in the drug conspiracy. Section 1957(f)(1) exempts a "transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution." For the reasons that follow, we do not believe Blair's conduct fits within this exception.

## A.

Blair makes the broad contention that any drug money that goes to the payment of counsel fees falls within the § 1957(f) safe harbor provision. Blair seeks this ambitious reading of the exception out of necessity. For only on this interpretation can he benefit from its safe harbor. This is because Blair is in the most tenuous position possible under the statute.

Blair's sweeping claim founders on several points. His principal mistake is that he ignores the language of § 1957(f). Congress used the words "as guaranteed by the sixth amendment" to define the scope of the safe harbor provision. 18 U.S.C. § 1957(f). That term was hardly the only one available to the legislative branch. Had Congress wanted to create a broad exception like the one Blair now seeks, it could have employed unqualified language exempting transactions "for payment of counsel." But it did not do so. Instead, Congress expressly tied the § 1957(f) exception to the Sixth Amendment right, on which the Supreme Court has the last and definitive word. As a result, the scope of the safe harbor provision is shaped by the Supreme Court's ongoing interpretation of the Sixth Amendment. Thus, anyone seeking to benefit from § 1957(f) must tie his conduct to the Sixth Amendment right to counsel.

Blair fails this basic test. In fact, his claim falls well outside the Sixth Amendment's guarantee. Blair used someone else's unlawful drug proceeds to pay for counsel for others. And then he took a cut of that money for himself. The drug money, of course, legally belonged to the United States. *See United States v. 92 Buena Vista Ave.*, 507 U.S. 111, 126–27 (1993) (plurality opinion) (title to forfeitable assets vests in the United States at the time the criminal act giving rise to the forfeiture is committed); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 627 (1989) (same); *United States v. Stowell*, 133 U.S. 1, 16-17 (1890) (same). Beyond that, it was Rankine who had stored the drug proceeds in a safe that

was in the possession of Elizabeth Nicely. Though Nicely had possession of the funds, they were not rightfully hers. And they were certainly not Blair's, who was but a lawyer called in by Nicely to help decide how to handle the drug proceeds.

The Supreme Court has been clear that there is no Sixth Amendment right to use someone else's money to hire counsel: "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney . . . ." *Caplin & Drysdale*, 491 U.S. at 626. Blair contends this proscription on the provision of unlawful proceeds to counsel is confined to a single forfeiture statute, 21 U.S.C. § 853. But forfeiture questions aside, *Caplin & Drysdale* makes clear that Blair's conduct does not fall under the Sixth Amendment's guarantee. As the Supreme Court explained, "A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his . . . ." *Caplin & Drysdale*, 491 U.S. at 626. Thus, Blair cannot meet the most basic requirement for protection under § 1957(f).

Blair nevertheless suggests that following the Supreme Court's clear command would render § 1957(f)(1) a dead letter. But Congress itself was well aware of that possibility when it drafted the exception. At the time of enactment, there was considerable division within the courts over whether the Sixth Amendment encompassed the right to use drug proceeds to secure legal representation. *Compare United States v. Monsanto*, 852 F.2d 1400 (2d Cir. 1988), *with In re Forfeiture Hearing as to Caplin & Drysdale, Chartered*, 837 F.2d 637 (4th Cir. 1988). Rather than join the fray and attempt to define the contours of the Sixth Amendment itself, Congress sensibly left the resolution of this issue to our nation's highest tribunal. That the Supreme Court subsequently reached an outcome adverse to Blair's position does not give him the right to relitigate the issue under a cloak of congressional intent.

Of course, if Congress wishes to uncouple the safe harbor provision from the Sixth Amendment, that is its prerogative. If the Supreme Court wishes to broaden the scope of the Sixth Amendment guarantee, that is its prerogative. But it is not our prerogative to take egregious conduct far beyond the scope of that constitutional provision and strong-arm it into the statute as it stands today.

That Blair's conduct was far beyond the scope of the Sixth Amendment would seem beyond dispute. In addition to using someone else's money, Blair hired counsel not for himself, but for others. But Sixth Amendment rights are at bottom *personal* to the accused. As the Supreme Court has noted, "The Sixth Amendment right to counsel is personal to the defendant and specific to the offense." *Texas v. Cobb*, 532 U.S. 162, 172 n.2 (2001). The district court noted precisely this point, observing that this case is "simply one in which the defendant alleges that the transaction had something to do with legal representation of somebody, and that's not the way the Court reads the statute." JA 785.

Congress did not, for example, intend for § 1957(f) to empower a drug lord to sprinkle money around to hire counsel for his underlings. This would undermine the attorney-client relationship. Where would the lawyer's allegiance lie in such a situation? Would it run to the person the lawyer represents or to the kingpin footing the bill? The possibilities for serious conflicts of interest are significant, and the unity at the core of the attorney-client relationship would be fractured. No longer could we be sure that the attorney was truly the client's champion, acting in the client's best interest. Indeed, the personal probity that allows defense counsel to effectively represent the accused would be compromised, if not lost. Congress drafted § 1957(f) to avoid this damaging state of affairs and stay true to the *personal* nature of Sixth Amendment rights.[3]

---

[3]To top it all off, Blair not only used someone else's money to secure counsel for others, but he also took nearly $10,000 for himself in the pro-

B.

It is important to keep the question here in some perspective. We face only a challenge to a single count of conviction under facts that locate the defendant's conduct well beyond the scope of the Sixth Amendment guarantee. While the dissent suggests that we identify various scenarios that "would or could fall within the safe harbor provision," Diss. Op. at 46, rendering advisory opinions on cases not before us is not the office of this court. With regard to Blair's conduct, were there no safe harbor provision, he unquestionably would be guilty of violating § 1957, which again prohibits knowingly engaging in a monetary transaction with criminally derived property of a value greater than $10,000. For the reasons stated above, we cannot see how Blair could navigate into any safe harbor. If in fact he could do so under heinous circumstances such as these, the "safe harbor" would become a safe ocean, and the statutory exception would swamp the rule.

It follows that we cannot accept the approach of our distinguished colleague in dissent. Our colleague is concerned about the prospect of prosecution of "legitimate criminal defense attorneys" who "accept bona fide legal fees from clients charged with or suspected of . . . criminal conduct." *Id.* at 33. But that is not at all the case before us. We have never suggested that the attorneys hired for Saunders and Bernard should come in for sanction. The only question facing us today is whether Blair, the person who paid for attorneys for others in a criminal enterprise with what he plainly knew to be criminally derived funds, is liable under § 1957. The statute is being applied to the defendant, not to anyone serving in

cess, an amount he claims was his fee for being co-counsel to Saunders. Never mind that Blair was not even licensed to practice in the Eastern District of Virginia at that time. And never mind that Blair obtained a pro hac vice admission only on the basis of his fraudulent application to practice in that jurisdiction. Blair not only placed himself in a position to monitor the government's investigation into the drug proceeds he was dispersing, but he also took close to $10,000 of those proceeds as a fee for doing so.

a representative capacity. The fact that Blair himself happens to be a lawyer is pure coincidence. If he were simply the head of a drug organization who decided to bankroll lawyers for others with criminally derived funds, which themselves were taken from others, the violation of § 1957 would seem apparent.

Given that the dissent acknowledges that "no one has a *constitutional* right to use . . . criminally derived proceeds to retain a defense attorney," *id.* at 42 (citing *Caplin & Drysdale*, 491 U.S. at 626), it necessarily must rely on a statutory exemption that sweeps more broadly than the Sixth Amendment. For three reasons, this expansive interpretation of § 1957(f)(1) cannot stand.

First, it cannot be squared with the *complete* text of the exemption. The dissent makes much of the words "necessary" and "preserve" to bolster its claim that the safe harbor provision goes beyond the Constitution, *id.* at 39, but it ends its textual analysis mid-sentence. Necessary to what? Preserve what? The statute could not be more clear: it protects only those transactions "necessary to preserve" the "right to representation *as guaranteed by the sixth amendment to the Constitution*." 18 U.S.C. § 1957(f)(1) (emphasis added). Dictionary definitions of general verbs cannot obscure the import of their more precisely phrased object.

Indeed, Congress did not select these words by accident. If it had wanted to, Congress could easily have gone beyond a constitutional floor. As the dissent points out, the original language of the safe harbor provision exempted "financial transactions involving the bona fide fees an attorney accepts for representing a client in a criminal investigation or any proceeding arising therefrom." Diss. Op. at 36 n.3 (quoting H.R. Rep. No. 99-855, pt. 1, at 1 (1986)). If this were the statute before us, we would face a different case. But Congress never enacted this version of the statute into law. It chose instead to tie the statutory exemption to the constitutional guarantee.

The dissent's contention that we read the safe harbor provision "out of existence," *id.* at 46, is defeated by the irony of our colleague reading into existence a statute that Congress never passed.

Second, the dissent's interpretation fails to respect the purpose of the safe harbor. The dissent suggests we risk "render-[ing] [this] provision meaningless" by reading it to cover "transactions that are already constitutionally protected." *See id.* at 39, 42. But including a statutory provision that tracks constitutional boundaries is hardly a novel form of legislative draftsmanship. *See, e.g.*, 16 U.S.C. § 5207(8) ("The term 'conduct' does not include speech protected by the first article of amendment to the Constitution."). Congress often relies on the Supreme Court's expertise in constitutional interpretation, *see, e.g.*, Antiterrorism and Effective Death Penalty Act of 1996 § 104, 28 U.S.C. § 2254(d)(1), just as it frequently incorporates state law, *see, e.g.*, 16 U.S.C. § 705 (criminalizing the transportation of birds that were captured "contrary to the laws of the State, Territory, or district" from which they were taken or shipped), or defers to administrative agencies. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). To adopt the dissent's position would hobble the legislature's ability to draw upon the insights of the other branches and organs of government and the unique expertise they bring to bear. For that is exactly what Congress has done here.

Third, the interpretation of our friend in dissent opens the door for lower courts to create a shadow jurisprudence apart from text and precedent. By pegging the scope of the exemption to the word "necessary" rather than to the Sixth Amendment, the dissent invites judges to reach results whose legal foundations are unclear. The dissent, for instance, suggests that while Blair can receive protection for his payments, payments for the "ongoing legal advice" of an attorney or payments of "an unreasonably large amount" to an attorney are not covered. Diss. Op. at 39-40. But why? Or why not? All

we are told is that it "will depend on the circumstances." *Id.* We fail to see how one can derive these fine-grained distinctions from the word "necessary." It is more prudent and respectful of congressional design to leave these contestable questions to the Sixth Amendment standard adopted by Congress and interpreted by the Supreme Court.

Even if we were to adopt the dissent's approach and hold the availability of the safe harbor here to hinge on the word "necessary," Blair's position would still be untenable. By no stretch of the imagination can his conduct be deemed "necessary" to securing anyone's right to counsel. There is no indication that Saunders and Bernard needed Blair to serve as a middle man to obtain legal representation. Blair's brief does not even contend as much. Even under the dissent's view, Nicely could have paid their attorneys from the same funds directly. Converting cash into bank checks may help in the dispersion of drug proceeds, but such money-changing was hardly "necessary" here to vindicate Sixth Amendment rights.

## C.

However one may view the matter, Blair's conduct falls far outside the safe harbor provision. Blair used someone else's criminally derived proceeds to bankroll counsel for others. Specifically, he drew on Rankine's drug money to fund the legal defense of the man charged with murdering Rankine and others. *See supra* p. 10 n.2. (Bernard eventually pled guilty to murder during a conspiracy to distribute drugs.) *Id.*

To apply § 1957(f)(1) on these facts would invite the worst kind of abuses. It would subject the ethical standards of the bar to the most formidable pressures and temptations. It would enable the Al Capones of our day and time to underwrite counsel for their underlings, thus maximizing the power and leverage of the top figures in criminal syndicates. And it would compromise the attorney-client relationship for their subordinates by creating an appearance at least that the lawyer

may be more attuned to and protective of the interests of the czar funding the defense than to the actual accused. It takes little effort to envision the numerous circumstances in plea negotiations and at trial where the interests of someone heading a criminal enterprise may be sharply at odds with those of one or more of its members, but Blair's position would place attorneys in a situation so riddled with conflict that courts would be hard-pressed to uphold it.

Allowing those in Blair's position to freely fund counsel for their associates carries other risks as well. Among the great assets the accused enjoys in our system is the unquestioned integrity of the criminal defense bar. In one sense, the attorney-client relationship is an indissoluble bond. But in another, there is a degree of separation in that an attorney whose own integrity is complete and unquestioned is able to champion those accused of the worst sort of crimes. This duality has served the interests of justice, and we should be loathe to let it go. Yet if criminal figures are permitted and encouraged to take criminally derived proceeds from others in order to bankroll attorneys for still others, what would we have then? If the public or the jury should come to associate attorneys more closely with underlying criminality, the chief loser will be that person whose rights the system is solemnly sworn to defend. We do not have that now, and we pray we never will.

### D.

The touchstone of § 1957(f)(1) is a solicitude for Sixth Amendment rights. Blair's conduct bears no connection to those rights as the Supreme Court has defined them or as the legal profession has long understood them. We therefore decline to overturn his aforementioned § 1957 conviction.

### V.

For the foregoing reasons, we affirm Blair's convictions for money laundering under 18 U.S.C. § 1956 (Counts 1, 5, 6,

and 8) and under 18 U.S.C. § 1957 (Count 9) and for failure to file tax returns under 26 U.S.C. § 7203 (Counts 13 and 14). We reverse Blair's conviction for obstruction of justice under 18 U.S.C. § 1503(a) (Count 11), having found insufficient evidence to support it. Accordingly, we remand for resentencing in light of this decision.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

TRAXLER, Chief Judge, dissenting from Part IV:

I cannot subscribe to the view that the "safe harbor" provision Congress created to shield criminal defense attorneys from prosecution under § 1957 is no longer effective. I do not believe this view is consistent with the statute. Moreover, I am troubled by the potential fallout from the elimination of the protection Congress afforded legitimate criminal defense attorneys when they accept bona fide legal fees from clients charged with or suspected of drug trafficking and other criminal conduct.

Blair's conduct was unquestionably reprehensible, and it was particularly offensive to members of the legal profession. The actual text of the statute, however, constrains me to conclude that the two transactions in question—which secured competent, legitimate criminal defense attorneys for Saunders and Bernard—are exempt from prosecution under § 1957(f)(1).

### A.

#### 1. Section 1957 and Its Purpose

Count 9 of the indictment charged Blair with violating 18 U.S.C. § 1957(a) when he used $20,000 in drug proceeds to purchase two $10,000 SunTrust bank checks to retain Vir-

ginia attorneys Boone and Yoffy to represent Saunders and Bernard, respectively. Although Blair also retained for himself $10,000 of the drug proceeds for legal services he purportedly performed, that fact was not charged in Count 9 as part of the offense conduct and has no bearing on whether Blair violated § 1957 by purchasing the bank checks.

Section 1957(a) provides that "[w]hoever . . . knowingly engages or attempts to engage in a *monetary transaction* in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity" shall be guilty of a crime. 18 U.S.C. § 1957(a) (emphasis added).[1] "Monetary transaction" as used in § 1957 "means the deposit, withdrawal, transfer, or exchange . . . of funds or a monetary instrument . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1). Thus, § 1957 criminalizes transactions that "mov[e] around at least $10,000 in criminal proceeds for any purpose through a financial institution," *United States v. Kratt*, 579 F.3d 558, 561 (6th Cir. 2009), provided that the defendant knows that "the subject of the transaction is criminally derived property." *United States v. Allen*, 129 F.3d 1159, 1165 (10th Cir. 1997). Unlike § 1956, which prohibits classic money laundering, § 1957 "does not require that the defendant know of a design to conceal aspects of the transaction or that anyone have such a design." *United States v. Wynn*, 61 F.3d 921, 926–27 (D.C. Cir. 1995); *see United States v. Rutgard*, 116 F.3d 1270, 1291 (9th Cir. 1997) ("The description of the crime does not speak to the attempt to cleanse dirty money by putting it in a clean form and so disguising it.").

Consequently, because § 1957 requires only that the defen-

---

[1]Under § 1957(a), the government must show: (1) "that the defendant knowingly engaged in a *monetary transaction*"; (2) "that the defendant knew the property involved derived from specified unlawful activity"; and (3) "that the property was of a value greater than $10,000." *United States v. Johnson*, 450 F.3d 366, 375 (8th Cir. 2006) (emphasis added).

dant know that the transaction involves proceeds of unlawful activity and contains no "'design to conceal' element, section 1957 prohibits a wider range of activity than money 'laundering,' as traditionally understood." *Wynn*, 61 F.3d at 927. Indeed, "[t]his statute applies to [even] the most open, above-board transaction[s]" that would otherwise be innocent and lawful. *Rutgard*, 116 F.3d at 1291. Congress enacted § 1957 "as a tool in the war against drugs," *id.*, designed to "make the drug dealers' money worthless" by criminalizing transactions in which the participants knowingly give or accept money derived from unlawful activity. H. R. Rep. No. 99-855, at 13 (1986) (internal quotation marks omitted); *see* Anti-Drug Abuse Act of 1986, Pub. L. 99-570, Subtitle H, 100 Stat. 3207 (1986). Thus, § 1957 applies by its plain terms not just to drug dealers and other criminal defendants but also to otherwise legitimate, law-abiding citizens who transact business with such individuals knowing that the transaction involved criminally derived proceeds.[2]

---

[2]The legislative history reflects that Congress wished to dissuade the public from transacting business with those suspected of drug trafficking or other criminal conduct:

> A person who engages in a financial transaction using the proceeds of a designated offense would violate this section if such person knew that the subject of the transaction were the proceeds of any crime. The [House Judiciary Committee's Subcommittee on Crime] is aware that every person who does business with a drug trafficker, or any other criminal, does so at some substantial risk if that person knows that they are being paid with the proceeds of a crime and then uses that money in a financial transaction. . . . [O]utstanding business people[,] who are otherwise totally moral[,] . . . are accepting these funds and profiting greatly from drug trafficking that is going on throughout this country, and this will put a stop to it.

H.R. Rep. No. 855, 99th Cong., 2d Sess. 13-14 (1986); *see also* H.R. Rep. No. 99-855, pt. 1, at 14 (remarks of Rep. Lungren) ("It is time for us to tell the local trafficker and everyone else, [i]f you know that person is a trafficker and has this income derived from the offense, you better beware of dealing with that person."). *See generally* D. Randall Johnson, "The Criminally Derived Property Statute: Constitutional and Interpretive Issues Raised by 18 U.S.C. § 1957," 34 *William & Mary L. Rev.* 1291,

Before passage of § 1957, there was substantial debate about whether a safe harbor provision should be included in the statute. The House Subcommittee on Crime was concerned about the exposure of criminal defense lawyers to prosecution for accepting tainted legal fees and proposed an exemption for attorney's fees in the original version of § 1957. Specifically, proponents of the attorney's fees exemption argued that it was necessary to prevent § 1957 from chilling the attorney-client relationship in criminal matters; without it, criminal defense attorneys might not investigate their clients' cases fully for fear of learning information that could trigger their own liability under the statute. *See* H.R. Rep. No. 855, at 14.[3] Ultimately, the exemption was dropped from the initial bill and § 1957 was enacted in 1986 without a safe harbor provision for attorney's fees.

The American Bar Association (ABA) and the National Association of Criminal Defense Lawyers (NACDL) remained concerned about the chilling effect of § 1957 on criminal defense attorneys and their clients, however, and continued to press for passage of a safe harbor provision. Congress enacted such a provision in 1988. *See* Pub. L. 100-690, § 6182, 102 Stat. 4181, 4354 (1988).

It is not hard to appreciate the problem faced by the criminal defense bar in the absence of an exemption. During the

1293 (1993) ("Congress specifically intended that liability under section 1957 should extend both to those who actually engage in the criminal activity that generates illegitimate funds and to those who merely receive or otherwise handle illegitimate funds while providing ordinary, legitimate goods or services.").

[3]The originally proposed safe harbor provision exempted "financial transactions involving the bona fide fees an attorney accepts for representing a client in a criminal investigation or any proceeding arising therefrom." H.R. Rep. No. 855, at 1. Opponents of the proposed exception were concerned that the exception was worded too broadly. *See* 132 Cong. Rec. E3821 (daily ed. Nov. 6, 1986).

routine process of investigating and preparing a client's case, an attorney might learn that his client's only income derived from criminal activity, making it technically illegal under § 1957 to receive and deposit further payments for legal fees. This possibility leaves the attorney with somewhat of a Hobson's choice at the outset of a case: either investigate fully and risk learning that the client's funds are tainted, or avoid thoroughly investigating any matter that might lead to such knowledge. Of course, failing to fully investigate is not really an option—an attorney who does so not only fails to fulfill his professional obligations to his client but, in light of the "willful blindness" doctrine, he is unlikely to circumvent the § 1957(a)'s knowledge requirement in any event. *See United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991) ("The willful blindness instruction allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he *purposely closed his eyes to avoid knowing what was taking place around him*.") (emphasis added); *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996) ("A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of *deliberate ignorance*.") (internal quotation marks omitted)(emphasis added).[4]

---

[4]Even the Justice Department recognized the real possibility that attorneys will run afoul of § 1957 with the receipt of legal fees or the use of trust accounts with funds originating from their clients and addressed the issue at length in the United States Attorney's Manual. *See* USAM 9-105.600, 9-105.921. The USA's Manual provides that Criminal Division approval is required before an attorney may be charged with a violation of § 1957. *See* USAM 9-105.300.3. Moreover, the Manual sets forth that, as a matter of policy, an attorney will not be charged under 18 U.S.C. § 1957 unless "there is proof beyond a reasonable doubt that the attorney had *actual knowledge* of the illegal origin of the specific property received (prosecution is not permitted if the only proof of knowledge is evidence of willful blindness)." USAM 9-105.600. This policy pronouncement affords criminal defense lawyers no particular comfort, however, because section 2103 of the United States Attorney's Criminal Resource Manual states that "a prosecutor who receives approval to prosecute an attorney for a violation of § 1957 based on a monetary transaction arising from the payment of bona fide fees for representation in a criminal matter may request a willful blindness instruction at trial if the evidence warrants such an instruction."

2.  The 1988 Safe Harbor Amendment to § 1957(f)(1)

In 1988, Congress amended the definition of "monetary transaction" to exclude "any transaction *necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution*." 18 U.S.C. § 1957(f)(1) (emphasis added). The effect of this safe harbor provision in § 1957(f)(1) was to exempt from prosecution under § 1957(a) an otherwise illegal transaction using criminally derived proceeds where that transaction is necessary to "secur[e] legal representation to which an accused is entitled under the Sixth Amendment." *See United States v. Velez*, 586 F.3d 875, 877 (11th Cir. 2009). The safe harbor provision added by the 1988 amendment was similar to a provision that was ultimately dropped from the version of § 1957 that was enacted in 1986. Congress was focused on the potential criminal liability of defense attorneys under § 1957 and the possible chilling effect on the attorney-client relationship such potential liability might produce.

The phrase "a person's right to representation as guaranteed by the sixth amendment to the Constitution" limits transactions protected under § 1957(f)(1) to those securing representation in connection with a criminal proceeding as opposed to any legal matter whatsoever. *See id.* ("[T]he exemption is limited to attorneys' fees paid for representation guaranteed by the Sixth Amendment in a criminal proceeding and does not extend to attorneys' fees paid for other purposes."). The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right includes, in part, "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). Thus, § 1957(f)(1) protects transactions that would otherwise be illegal, provided the transaction secures legal representation in a criminal proceeding; it does not extend, for example,

to the use of drug proceeds to secure legal representation in the civil context.

Although the safe harbor provision ties an exempt transaction under § 1957(f)(1) to the Sixth Amendment, it does not require that the *transaction* itself be constitutionally protected. Rather, it is the *representation*—secured by the transaction—that must come within the Sixth Amendment's guarantee. *See Velez*, 586 F.3d at 879 (explaining that "the phrase 'representation as guaranteed by the sixth amendment' refers, as it always has, to the *type* of legal representation to which a criminal defendant is entitled under the Sixth Amendment") (emphasis added). In using the words "to preserve," which means "[t]o keep in perfect or unaltered condition" and to "maintain unchanged," *The American Heritage College Dictionary* 1082 (3d ed. 1997), Congress made clear that an exempt transaction under § 1957(f)(1) must be necessary *to secure* a person's Sixth Amendment right to legal representation. *See Velez*, 586 F.3d at 877. Thus, the transaction itself need not be protected by the Sixth Amendment to come within § 1957(f)(1)'s safe harbor, but it must be *necessary to secure* a person's Sixth Amendment right to representation. This is confirmed by common sense—it would accomplish little for Congress to provide an exemption for transactions that are already constitutionally protected.

Of course, not every transaction that secures legal representation in a criminal proceeding comes within the scope of the safe harbor provision. Section 1957(f)(1) requires that a transaction be "necessary" to secure a person's sixth amendment right to representation. This limit has not been thoroughly fleshed out by the courts, but it seems clear that the availability of the safe harbor will depend on the circumstances. For example, a general retainer to an attorney for ongoing legal advice would not likely qualify for protection under § 1957(f)(1). "Correctly read, the statute offers a defense where a defendant engages in a transaction underlying a money laundering charge with the *present intent* of exercising

Sixth Amendment rights." *United States v. Hoogenboom*, 209 F.3d 665, 669 (7th Cir. 2000) (emphasis added). Likewise, the payment of an unreasonably large amount in light of the complexity of the criminal proceeding might not qualify as a transaction necessary to secure a person's Sixth Amendment rights.

### 3. Application to Blair

In Blair's case, the transactions at issue in Count 9 were "necessary to preserve a person's right to representation as guaranteed by the sixth amendment." 18 U.S.C. § 1957(f)(1). First, it would be difficult to find that the purchase of the two bank checks was not done for the purpose of securing legal representation in a criminal proceeding. Blair purchased checks that were handed over to the Virginia attorneys to secure representation for Saunders and Bernard on drug charges pending in federal court. Second, the amount of each check was reasonable in light of what a criminal defense attorney might legitimately charge for a retainer. *Compare Hoogenboom*, 209 F.3d at 669 (concluding that the withdrawal of money from a bank account for the purpose of subsequently paying legal fees was not protected under § 1957(f)(1)).

Finally, it bears mentioning that the transactions at issue are not taken outside of the safe harbor provision because Blair secured representation for Saunders and Bernard rather than himself. There is simply no basis in the statutory text for concluding that the safe harbor provision applies only if the transaction was to secure *the payor's* Sixth Amendment rights. Quite the opposite. A transaction comes within § 1957(f)(1) if it is "necessary to preserve *a person's* right to representation as guaranteed by the sixth amendment." 18 U.S.C. § 1957(f)(1) (emphasis added). In the context of criminal defense work, it is not uncommon for legal fees to be paid by a family member, a friend, an employer, or some other third party. In such a case, it is well understood that the attorney's

loyalty is to his client, the criminal defendant, not the person who paid the fee. This is fundamental professional responsibility. *See, e.g.*, Va. R. Prof. Conduct R. 1.8(f); Va. R. Prof. Conduct R. 5.4(c). It would undercut the purpose of the amendment to engraft a requirement that the transaction be necessary to preserve the *payor's* Sixth Amendment rights—an attorney is exposed to criminal liability under § 1957 if he learns that his fees are the proceeds of unlawful activity no matter who paid them.

## B.

The government contends that the safe harbor provision of § 1957(f)(1) does not apply to transactions involving drug proceeds. This clearly cannot be correct. As explained above, for any "monetary transaction" to violate § 1957, the property involved must have "derived from specified unlawful activity." 18 U.S.C. § 1957(a). By its very terms, § 1957 requires the government to establish that the illegal monetary transaction involved property that "derived from specified unlawful activity." 18 U.S.C. § 1957(a); *see United States v. Johnson*, 450 F.3d 366, 375 (8th Cir. 2006). It follows that any transaction that comes within § 1957 itself, and within its safe harbor, will necessarily involve tainted proceeds. That is, criminal liability can arise under § 1957 only if the funds at issue are criminally derived proceeds. Neither the statute nor its exemption come into play in the absence of criminally derived proceeds. *See Velez*, 586 F.3d at 877. *It is a given* that any time a defendant raises § 1957(f)(1) as a shield, the underlying transaction involves proceeds from unlawful activity such as cash from the sale of drugs.

The government's position, as I understand it, is that Congress used the phrase "as guaranteed by the sixth amendment" to signal that the scope of the statutory exemption is *co-extensive* with the scope of the sixth amendment. According to the government, § 1957(f)(1) applies only if the defendant can show that he has a Sixth Amendment right to use the par-

ticular funds in question to retain legal counsel. Relying on *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989), the government contends that Blair can establish no such right because the Sixth Amendment does not confer the right to use drug proceeds or any other property that does not belong to him to obtain legal counsel.

There are several problems with the government's position. First, this interpretation would render the safe harbor provision meaningless and fly in the face of the interpretive canon requiring courts to "give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous." *Scott v. United States*, 328 F.3d 132, 139 (4th Cir. 2003).[5] Clearly, no one has a *constitutional* right to use drug money or other criminally derived proceeds to retain a defense attorney. *See Caplin & Drysdale*, 491 U.S. at 626. Since any transaction that comes within § 1957(f)(1)'s safe harbor will necessarily involve criminally derived proceeds, the government's position effectively reads this provision out of the statute. *See Velez*, 586 F.3d at 879 ("It would . . . make little sense—and would be entirely superfluous—to read § 1957(f)(1) as an exemption from criminal penalties for *non-tainted* proceeds spent on legal representation, as those funds can always be used for any legal purpose. . . . [S]uch an absurd result . . . nullifies the provision and divorces it from its statutory context, thereby violating basic canons of statutory construction.").

Second, the government's position that the safe harbor provision is co-extensive with the Sixth Amendment—leaving it to the Supreme Court to resolve—ignores the language of the statute. As the government would have it, the *transaction itself* must be constitutionally protected. That is not how § 1957(f)(1) reads. Moreover, if Congress wanted the scope of this provision to be defined solely by the Sixth Amend-

---

[5]The government, in fact, took the position at oral argument that after *Caplin & Drysdale*, § 1957(f)(1) is effectively void.

ment, why would an exemption be necessary or even desirable? Such an approach would be baffling. If the Supreme Court determined that use of criminally derived proceeds to secure legal counsel were protected under the Sixth Amendment, then Congress would have accomplished nothing by protecting a transaction already protected by the Sixth Amendment. If, as is the case, the Court determined that the Sixth Amendment does not confer the right to use proceeds from unlawful activity to hire counsel, then the exemption is rendered dead. Such an interpretation—that the scope of § 1957(f)(1) and the Sixth Amendment are coextensive—offends the plain language of the statute and does not reasonably fit in light of the statute's overall structure. *See Velez*, 586 F.3d at 879 n.3.

Third, the government's argument goes awry largely because of its insistence that *Caplin & Drysdale* controls the outcome of this case, having rendered the safe harbor provision in § 1957(f)(1) null and void. *Caplin & Drysdale*, however, clearly does not control, and it is a mistake to force its use as an interpretive guide in this instance.

In *Caplin & Drysdale*, the Supreme Court considered whether the federal drug forfeiture statute, *see* 21 U.S.C. § 853(c), violated the Sixth Amendment by permitting the forfeiture of assets that a defendant intended to use to hire his preferred legal counsel, *see* 491 U.S. at 625. The Court concluded the forfeiture statute was not at odds with the Sixth Amendment, reasoning that the right to choose counsel

> does not go beyond the individual's right to spend his own money to obtain the advice and assistance of . . . counsel. . . . A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice.

*Id.* at 626 (internal quotation marks omitted).[6] The Court recognized that, by operation of the forfeiture statute, forfeitable drug proceeds do not belong to the accused: "Congress dictated that '[a]ll right, title and interest in property' obtained by criminals via the illicit means described in the statute 'vests in the United States upon the commission of the act giving rise to forfeiture.'" *Id.* at 627 (quoting 21 U.S.C. § 853(c)). Thus, *Caplin & Drysdale* establishes that the Sixth Amendment does not preclude Congress from forfeiting drug proceeds that the accused needs to retain his selected attorney.

*Caplin & Drysdale*, however, simply does not speak to the meaning of § 1957(f). In the forfeiture statute, Congress chose not to provide an exemption for attorney's fees. The Court in *Caplin & Drysdale* refused to read such an exception into the statute and concluded that the statute passed muster under the Sixth Amendment even without such an exception. In § 1957(f)(1), by contrast, Congress *did provide* an exemption for attorney's fees. Therefore, for purposes of this case, it matters not that the Sixth Amendment does not confer the right to use drug proceeds to secure legal counsel; Congress has done so in the limited context of money laundering under § 1957.

The Eleventh Circuit, in an extensive analysis, rejected the idea that *Caplin & Drysdale* has any bearing on § 1957(f)(1).

---

[6]The Supreme Court elaborated further:

> A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense. "[N]o lawyer, in any case, . . . has the right to . . . accept stolen property, or . . . ransom money, in payment of a fee. . . . The privilege to practice law is not a license to steal." *Laska v. United States*, 82 F.2d 672, 677 (10th Cir. 1936).

*Caplin & Drysdale*, 491 U.S. at 626.

*See Velez*, 586 F.3d at 878-79. I find the court's reasoning persuasive:

> [*Caplin & Drysdale*] held simply that Congress may require the forfeiture of criminally derived proceeds, even if those proceeds are used for legal representation, without running afoul of the Sixth Amendment right to counsel. Contrary to the Government's argument, *Caplin & Drysdale* did not alter or refine the meaning of the Sixth Amendment limitation to the exemption in § 1957(f)(1) by its (unremarkable) holding that the Sixth Amendment alone does not require an exemption from forfeiture for tainted proceeds used for attorneys' fees. Rather, the opinion supports our interpretation of § 1957(f)(1) by highlighting the contrast between Congress's failure to exempt criminally derived proceeds used for attorneys' fees from forfeiture and its subsequent decision to exempt such proceeds from criminal penalties.
>
>   . . .
>
> We likewise view the exemption for attorneys' fees as a crucial distinction between the criminal charges at issue under § 1957 and the forfeiture provision, and we do not read *Caplin & Drysdale* as having any bearing on the phrase "representation as guaranteed by the sixth amendment" in § 1957(f)(1), except to affirm that distinction.

*Velez*, 586 F.3d at 878-79 (citation omitted).

In sum, *Caplin & Drysdale* established that the Sixth Amendment does not prohibit the forfeiture of criminally derived proceeds, even if those proceeds are needed for the defendant to hire the attorney of his choice. Section 1957(f)(1), however, establishes that the use of criminally

derived proceeds to hire a criminal defense attorney is not itself a fresh criminal act under § 1957(a), provided the defendant can satisfy the "necessity" requirement of § 1957(f)(1). In no sense, therefore, does *Caplin & Drysdale* render the plain language of § 1957(f)(1) inoperative.

## C.

At bottom, the court today nullifies the § 1957(f)(1) exemption and creates a circuit split. *See Velez*, 586 F.3d at 879. Section 1957 makes it a crime to engage in monetary transactions with money derived from certain specified criminal activities, but § 1957(f)(1) excludes from the definition of "monetary transactions" "any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution." As discussed above, the phrase "as guaranteed by the sixth amendment to the Constitution" modifies "right to representation," thus making it clear that the safe harbor applies to monetary transactions involving representation on a criminal charge rather than a civil matter. It appears to me that the court, however, reads that phrase as modifying "transaction," such that the only transactions protected by the safe harbor are *transactions* that are themselves "guaranteed by the sixth amendment."

Because the Supreme Court has held that the sixth amendment does not require that criminal defendants be permitted to use tainted proceeds to pay for a criminal defense attorney, there simply is no monetary transaction that would otherwise fall within the scope of § 1957 that could ever be seen as being guaranteed by or required by the sixth amendment. No one can point to a single circumstance where a transaction involving criminally derived proceeds otherwise subject to prosecution under § 1957(a) would or could fall within the safe harbor provision. The safe harbor exemption is thus read out of existence.

And to make matters worse, by agreeing with the government, we have given defense attorneys cause for concern that

once again they risk criminal liability under § 1957 for receiving and depositing legal fees that they suspect to be tainted. This encourages the return of the chilling effect that Congress sought to avoid through its 1988 amendment adding the safe harbor provision to § 1957. Accordingly, I respectfully dissent as to Part IV.