Attorney Grievance Commission of Maryland v. Walter Lloyd Blair
Misc. Docket AG No. 83, September Term, 2009

**ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT –** Court of Appeals disbarred lawyer who concocted and executed scheme to launder drug money that he obtained from client, engaged in witness tampering by advising client not to tell Federal Bureau of Investigation agents about drug money, provided to Internal Revenue Service agents false information about drug money, and willfully failed to file federal income tax returns for two years. Such conduct violated Maryland Lawyers' Rules of Professional Conduct 8.4(b) (Criminal Act), 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation), and 8.4(d) (Conduct That Is Prejudicial to Administration of Justice).

Argued: May 31, 2018

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 83
September Term, 2009

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

WALTER LLOYD BLAIR

_____

Greene
Adkins
Watts
Getty
Harrell, Jr. Glenn T.
    (Senior Judge, Specially Assigned)
Battaglia, Lynne A.
    (Senior Judge, Specially Assigned)
Raker, Irma S.
    (Senior Judge, Specially Assigned)


JJ.

_____

Opinion by Watts, J.
Adkins, Harrell and Raker, JJ., concur and
dissent.

_____

Filed: July 13, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

This attorney discipline proceeding involves a lawyer who, in the words of the United States Court of Appeals for the Fourth Circuit, "concocted and executed a scheme to launder drug proceeds that he obtained from a client." United States v. Blair, 661 F.3d 755, 759 (4th Cir. 2011) (per curiam), cert. denied, 567 U.S. 905 (2012). In its opinion disposing of the first appeal in the lawyer's criminal case, the Fourth Circuit set forth the facts underlying the lawyer's convictions for money laundering, witness tampering, making a false statement, and willful failure to file a federal income tax return—all of which the Fourth Circuit affirmed. See Blair, 661 F.3d at 759.

According to the Fourth Circuit, Elizabeth Nicely Simpson, a prospective client, told Walter Lloyd Blair, Respondent, a member of the Bar of Maryland, that she possessed a safe that contained drug money belonging to Anthony Rankine, who had operated a large marijuana distribution ring near Richmond, Virginia. See id. at 759-60. Among other things, Blair invented a lie regarding drug money being from a legitimate source, and told Simpson to tell the lie if anyone inquired about the drug money. See id. at 760-61. Without being asked to do so, Blair caused a corporation to be created through which Simpson could buy and sell real estate with the drug money. See id. at 761.

After agents of the Federal Bureau of Investigation ("the FBI") contacted Simpson to interview her, Blair told Simpson not to tell the FBI agents about the drug money, and to instead talk to the agents only about a car that Simpson had purchased for Rankine. See id. at 762. Blair told Simpson that, if the money came up, she should use the lie that he had made up regarding the money being from a legitimate source. See id.

In a federal court in Virginia, Blair applied for admission *pro hac vice* to represent

one of Rankine's associates as co-counsel.  See id. at 763.  In his *pro hac vice* application, Blair misrepresented that he had never been subject to disciplinary action by a bar association.  See id.  Contrary to Blair's application, the Supreme Court of Appeals of West Virginia had previously suspended him from the practice of law in West Virginia based on witness tampering.  See id. at 763, 767.

During an investigation of the marijuana distribution ring and money laundering scheme, FBI agents discovered that Blair had failed to file federal income tax returns for two years, including the year in which he had taken some of the money from the safe for himself.  See id. at 768, 761.

In the United States District Court for the District of Maryland ("the District Court"), the United States Attorney's Office for the District of Maryland filed an indictment against Blair, charging him with: nine counts of money laundering; one count each of witness tampering, obstruction of justice, and making a false statement; and two counts of willful failure to file federal income tax returns.  A jury found Blair guilty of all fourteen charges.  Blair's convictions came to Bar Counsel's attention.

On May 3, 2010, on behalf of the Attorney Grievance Commission, Petitioner, Bar Counsel filed in this Court a "Petition for Disciplinary or Remedial Action" against Blair, initiating Attorney Grievance Comm'n v. Walter Lloyd Blair, Misc. Docket AG No. 83, Sept. Term, 2009.  In the Petition, Bar Counsel charged Blair with violating Maryland

Lawyers' Rules of Professional Conduct ("MLRPC")[1] 8.4(b) (Criminal Act), 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation), and 8.4(d) (Conduct That Is Prejudicial to the Administration of Justice).

On May 3, 2010, this Court issued a Show Cause Order, noting that Blair's convictions were for "serious crimes" as defined in former Maryland Rule 16-701(k),[2] and directing Blair to show cause why he should not be suspended immediately from the practice of law in Maryland until further order of the Court. On June 8, 2010, Blair filed a response to the Show Cause Order in which he requested that this Court refrain from suspending him from the practice of law until the Fourth Circuit, and possibly the Supreme Court, disposed of the direct appeal in his criminal case.

On July 21, 2010, this Court issued an Order suspending Blair immediately from the practice of law in Maryland with the invitation to request reconsideration if the Fourth

---

[1]Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct, or MARPC, and renumbered. We will refer to the MLRPC because the misconduct at issue occurred before this change.

[2]Former Maryland Rule 16-701(k) stated:

> "Serious crime" means a crime that is in at least one of the following categories: (1) a felony under Maryland law, (2) a crime in another [S]tate or under federal law that would have been a felony under Maryland law had the crime been committed in Maryland, and (3) a crime under federal law or the law of any [S]tate that is punishable by imprisonment for three years or more.

All of the crimes of which Blair was convicted, except for willful failure to file federal income tax returns, were punishable by at least three years of imprisonment, and thus were serious crimes under former Maryland Rule 16-701(k). See 18 U.S.C. §§ 1956(a)(1) (Money Laundering), 1957(b)(1) (same), 1512(b) (Witness Tampering), 1503(b) (Obstruction of Justice), 1001(a) (Making a False Statement); 26 U.S.C. § 7203 (Willful Failure to File Federal Income Tax Return).

Circuit ruled in his favor. See Attorney Grievance Comm'n v. Blair, 415 Md. 119, 120, 999 A.2d 182, 182 (2010). In addition to the action taken by this Court, the District of Columbia Court of Appeals summarily disbarred Blair based on his conviction for witness tampering. See In re Blair, 40 A.3d 883, 884 (D.C. 2012) (per curiam). On September 21, 2011, the Fourth Circuit affirmed thirteen of Blair's convictions, but reversed the conviction for obstruction of justice due to insufficient evidence, and remanded the case for resentencing. See Blair, 661 F.3d at 759, 775.

On remand, the District Court resentenced Blair to an aggregate sentence of ninety-seven months of imprisonment, three years of supervised release, and a $100,000 fine. On or about July 11, 2017, Blair was released from federal custody. On December 1, 2017, Blair filed with this Court a Petition for Reinstatement, in which, for the first time, he informed this Court and Bar Counsel of the opinion in which the Fourth Circuit disposed of the first appeal in his criminal case by affirming thirteen of his convictions.

On January 30, 2018, Bar Counsel filed a Response in Opposition to the Petition for Reinstatement, contending that the Petition for Reinstatement was not ripe because there had not yet been a final disposition in this attorney discipline proceeding. On the same date, Bar Counsel filed a Motion for Final Disposition or, in the Alternative, Further Proceedings in this attorney discipline proceeding. Bar Counsel recommended that we disbar Blair based on the serious crimes of which he was convicted. On February 1, 2018, Blair filed a Reply to the Motion for Final Disposition or, in the Alternative, Further Proceedings, requesting that we deny Bar Counsel's request for disbarment and, in the alternative, that this Court order "further proceedings . . . in such form as this Court deems

- 4 -

appropriate[.]"

On April 25, 2018, Bar Counsel filed a Recommendation for Sanction, again recommending that we disbar Blair and deny the Petition for Reinstatement. On May 7, 2018, Blair filed a Renewed Petition for Reinstatement and Response to the Attorney Grievance Commission's Recommendation for Sanction, again requesting that we reinstate him to the practice of law in Maryland.

On May 31, 2018, we heard oral argument. For the below reasons, we disbar Blair.

## BACKGROUND

On October 3, 1996, this Court admitted Blair to the Bar of Maryland.

### Events That Gave Rise to Blair's Convictions

In Blair, 661 F.3d 755—the opinion in which the Fourth Circuit handled the first appeal in Blair's criminal case—the Fourth Circuit described the events that gave rise to his convictions. Specifically, according to the Fourth Circuit, in 2003, a man named Rankine operated a large marijuana distribution ring near Richmond. See id. at 759. In August 2003, Simpson bought a Cadillac for Rankine. See id. Rankine provided Simpson with $18,000 for the down payment, and promised to reimburse her for the remainder of the Cadillac's cost. See id. Despite the Cadillac being titled in Simpson's name, Rankine, not Simpson, used the Cadillac. See id. Shortly after Simpson bought the Cadillac, her sister, Janet, asked her to store at her house a safe that belonged to Rankine. See id. Although Simpson knew that Rankine was a marijuana distributor, she agreed to store the safe at her house. See id. Rankine brought his safe to Simpson's house, but did not provide her with a key or combination number for the safe. See id.

- 5 -

In Fall 2003, Tasha Robinson, Rankine's girlfriend, was found dead in his home in Richmond. See id. Initially, the whereabouts of Rankine, as well as Robinson's son, were unknown. See id. Within weeks, Rankine and Robinson's son were also found dead. See id. Around this time, Simpson learned that Rankine's safe contained drug money, and believed that she may have been in danger. See id. Simpson began to receive threats about the drug money in Rankine's safe, and a coworker advised Simpson to contact a criminal defense lawyer. See id. at 760. On November 4, 2003, Simpson telephoned Blair and told him that she possessed a safe with drug money that belonged to Rankine, that Robinson had been murdered, and that Rankine was missing. See id. Blair warned Simpson that the telephonic conversation might not be secure, told her not to say anything else, and requested that she come to his office later that day. See id.

Simpson and Michael Henry, her coworker, went to Blair's office. See id. Simpson again told Blair that she possessed a safe with drug money that belonged to Rankine. See id. Simpson also told Blair that she was worried about being tied to the Cadillac, and was frightened because of the violence that had been linked to Rankine. See id. Simpson showed Blair online media articles that linked Robinson's murder and Rankine's disappearance. See id. Simpson told Blair that she had gotten a telephone call from someone who said that Dashawn Saunders, a member of the marijuana distribution ring, was incarcerated in Richmond and needed the drug money to pay for a lawyer. See id. at 759-60. Blair advised Simpson and Henry to open Rankine's safe "by any means necessary," and bring its contents to him. Id. at 760.

Simpson and Henry opened Rankine's safe, which contained drug money in the

form of rubber-banded stacks of cash.  See id.  Simpson and Henry put the drug money into a duffel bag without counting it.  See id.  Simpson and Henry gave the duffel bag to Blair, who asked Simpson to leave the room while he and Henry counted the drug money.  See id.  Henry watched Blair count approximately $170,000.  See id.  After Simpson reentered the room, Blair falsely told her that the duffel bag had contained $70,000.  See id.

Blair told Simpson and Henry that, if anyone asked, they should say that the drug money was "partner money."  Id.  "Partner money" is a term that arises out of a practice within the Jamaican culture, and Simpson and Henry—who, like Blair, were originally from Jamaica—understood the term when Blair used it.  See id.  That practice, described as follows, allows individuals of modest means to obtain a substantial amount of funds that they would not be able to borrow from a lending institution.  See id.  First, a group of individuals, or "partners," regularly contribute a given amount of money—i.e., "partner money"—to a pool.  See id. at 760-61.  One person, the "banker," holds onto the pool.  See id. at 761.  At some point, the banker provides the pool to one of the partners.  See id.  After the partners make enough additional contributions to replenish the pool, the banker provides it to another partner.  See id.  This process repeats until the banker has provided the pool to every partner at some point.  See id.

In addition to telling Simpson and Henry to say that the drug money from Rankine's safe was "partner money," Blair told Simpson to say that Robinson, Rankine's deceased girlfriend, was the banker.  See id.  Blair explained that naming Robinson as the banker would be effective because she was deceased, so nobody would know the truth.  See id.

Even though Simpson had not asked Blair to do so, he said that he intended to create a corporation through which she could use some of the drug money to buy real estate. See id. A lawyer in Blair's firm prepared "Articles of Incorporation" for "Jay Paul Property Management," listing Simpson and Henry as officers. See id. Blair gave Simpson a "Retainer and Fee Agreement," on which he told her to write: (1) "This is a retainer to establish my corporation [for] the purpose of buying and selling real estate in the DC metro area."; (2) "I also authorize and retain Blair & Lee[3] to recover my vehicle or [t]ake appropriate action to protect my interest"; and (3) "Initial deposit for new bank account $7,000.00." See Blair, 661 F.3d at 761 (some alterations in original).

Blair told Simpson and Henry to set aside some of the drug money to pay the legal fees of Saunders and Richard Bernard, associates of Rankine who had been charged in the United States District Court for the Eastern District of Virginia with conspiracy to distribute drugs. See id. at 761, 763 & n.2.

Blair took Simpson and Henry to meet Vassel Clarke, a mortgage broker, and asked him to find and buy real estate on Simpson's behalf. See id. Blair—who brought to the meeting the duffel bag with approximately $170,000 in drug money—falsely told Clarke that the duffel bag contained $100,000 in "partner money." See id. Blair asked Clarke to take all of the "partner money" to invest on Simpson's behalf. See id. Clarke refused, and instead took only $9,000. See id. Blair retained the remaining drug money. See id.

---

[3]Blair's law firm's name was "Blair and Lee, P.C." See Walter Lloyd Blair v. United States, Nos. 8:08-cr-00505-PJM-1, 8:14-cv-00766-PJM, 2016 WL 6569064, at *2 (D. Md. Nov. 4, 2016), appeal dismissed, 688 F. App'x 192 (4th Cir. 2017).

To secure representation for Saunders and Bernard, Blair contacted David Boone and James Yoffy, lawyers in Virginia. See id. Boone agreed to represent Saunders, with Blair as Boone's co-counsel, and Yoffy agreed to represent Bernard. See id. Blair took $30,000 of the drug money—$10,000 for himself, $10,000 to buy a SunTrust Bank cashier's check for Boone, and $10,000 to buy a SunTrust Bank cashier's check for Yoffy. See id.

On November 7, 2003, Simpson and Clarke went to a branch of BB&T Bank, where Simpson opened a personal checking account and deposited the $9,000 in drug money that Blair had given Clarke the previous day. See id. Afterward, Simpson and Blair went to a branch of SunTrust Bank, where they attempted to open a business account for Jay Paul Property Management. See id. Simpson and Blair were unable to open such an account because Jay Paul Property Management lacked a tax identification number. See id. Instead, Blair opened a business account under the name "Blair & Associates, LLC, for Jay Paul Property Management." Id. at 761-62. Contrary to the Retainer and Fee Agreement— which indicated that $7,000 would be deposited into Jay Paul Property Management's business account—Blair deposited $6,000 into the account, and kept $1,000 as a fee for creating Jay Paul Property Management. See id. at 762.

A few days later, Blair gave Clarke an additional $31,000 of the drug money to buy real estate on Simpson's behalf. See id. at 762. Blair warned Clarke not to deposit all of the money at once. See id. As such, Clarke made multiple deposits into Simpson's personal checking account at BB&T Bank. See id.

Clarke found two pieces of real estate for Simpson to buy. See id. First, Simpson

bought a house in Washington, D.C.  See id.  To pay the deposit, Simpson wrote a $2,000 check on her personal checking account at BB&T Bank.  See id.  To pay the amount that was due at closing, Simpson used her personal checking account at BB&T Bank to buy a $12,432 bank check.  See id.  Next, Simpson bought a tract of land in Maryland.  See id. To pay the deposit, Simpson wrote a $5,000 check on her personal checking account at BB&T Bank.  See id.

On November 12, 2003, FBI agents informed Simpson that they wanted to interview her about the Cadillac, which had been linked to drug trafficking in Richmond.  See id. Simpson refused to answer any questions, and referred the FBI agents to Blair.  See id. Simpson went to Blair's office and asked how she should handle questions by the FBI agents.  See id.  Blair told Simpson not to tell the FBI agents about the drug money, and to speak to the agents only about the Cadillac.  See id.  Blair told Simpson that, if the drug money came up, she should falsely state that drug money was "partner money."  See id. During the meeting, Blair tape-recorded Simpson as she rehearsed what she would say to the FBI agents.  See id.  On November 13, 2003, Blair gave Simpson a letter and told her to memorize it.  See id.  Blair's letter described the lie that he had made up regarding the drug money being "partner money."  See id.

On November 17, 2003, ostensibly as Boone's co-counsel, Blair filed in the United States District Court for the Eastern District of Virginia an application for admission *pro hac vice* so that he could represent Saunders.  See id. at 763.  In his application, Blair misrepresented that he had never been reprimanded by a court or subject to disciplinary action by a bar association.  See id.  Contrary to Blair's application, in 1984, the Supreme

Court of Appeals of West Virginia suspended Blair from the practice of law in West Virginia for six months based on witness tampering. See id. at 767. The United States District Court for the Eastern District of Virginia granted Blair's application. See id. at 763. Blair and Boone served as Saunders's counsel of record until July 2004, when Saunders was sentenced after pleading guilty. See id.

During an investigation of the marijuana distribution ring and Blair's money laundering, FBI agents discovered that Blair had failed to file federal income tax returns for 2002 and 2003. See id. at 768.

**Blair's Criminal Case**

Blair attached to the Petition for Reinstatement the docket entries and an appendix to a petition for a writ of *certiorari* in his criminal case, which includes a Superseding Indictment filed in his case. In the Superseding Indictment, the Grand Jury for the District of Maryland indicted Blair with fourteen crimes, which we identify in the below table:

| Count: | Charge: | Underlying Event: |
|---|---|---|
| 1 | Money Laundering under 18 U.S.C. § 1956(a)(1)(B)(i) | On or about November 6, 2003, Simpson gave Blair more than $70,000. |
| 2 | Same | On or about November 6, 2003, Blair gave Clarke $9,000. |
| 3 | Same | On or about November 7, 2003, Blair deposited $6,000 into an account at SunTrust Bank. |
| 4 | Same | On or about November 11, 2003, Blair gave Clarke $31,000. |
| 5 | Same | On or about November 22, 2003, Simpson gave a $2,000 check on an account at BB&T Bank to the seller of a piece of real estate in Washington, D.C. |
| 6 | Same | On or about November 28, 2003, Simpson gave a $5,000 check on an account at BB&T Bank to the seller of a piece of real estate in Maryland. |
| 7 | Same | On or about December 17, 2003, Blair bought from |

| | | SunTrust Bank a $6,000 bank check that was payable to another lawyer. |
|---|---|---|
| 8 | Same | On or about January 8, 2004, Simpson bought from BB&T Bank a $12,432.31 bank check. |
| 9 | Money Laundering under 18 U.S.C. § 1957(a) | On or about November 12, 2003, Blair bought from SunTrust Bank two bank checks that totaled $20,000. |
| 10 | Witness Tampering under 18 U.S.C. § 1512 | On or about November 12, 2003, Blair told Simpson not to tell the FBI agents about the drug money, and that, if the drug money came up, she should provide false information. |
| 11 | Obstruction of Justice under 18 U.S.C. § 1503 | On or about November 11, 2003, Blair misrepresented to the United States District Court for the Eastern District of Virginia that he had never been reprimanded by a court, and that there had not been an action in any court regarding his conduct or fitness as a member of a bar. |
| 12 | Making a False Statement under 18 U.S.C. § 1001(a)(2) | On or about July 6, 2005, during an interview with agents of the Internal Revenue Service ("the IRS"), Blair provided false information about the nature, source, and amount of the drug money. |
| 13 | Willful Failure to File Federal Income Tax Return under 26 U.S.C. § 7203 | Blair failed to file a federal income tax return for 2002. |
| 14 | Same | Blair failed to file a federal income tax return for 2003. |

On December 15, 2009, a jury found Blair guilty of all fourteen charges. On April 23, 2010, the District Court sentenced Blair. Blair filed a notice of appeal.

On September 21, 2011, the Fourth Circuit issued a *per curiam* opinion in which it reversed Blair's conviction for obstruction of justice due to insufficient evidence, but affirmed his thirteen other convictions, and remanded for resentencing. See Blair, 661 F.3d at 775. The three-judge panel of the Fourth Circuit was unanimous on every issue, except as to whether the District Court erred in denying a motion to dismiss Count 9 (Money Laundering under 18 U.S.C. § 1957(a)). See id. at 770. Chief Judge William B. Traxler,

Jr., who dissented with respect to Blair's conviction for money laundering under 18 U.S.C. § 1957(a), wrote: "Blair's conduct was unquestionably reprehensible, and it was particularly offensive to members of the legal profession." Id. at 776 (Traxler, C.J., dissenting). Blair petitioned for a writ of *certiorari*. On June 11, 2012, the Supreme Court denied the petition. See Blair, 567 U.S. 905.

On March 20, 2012, at a resentencing proceeding, the District Court sentenced Blair to ninety-seven months of imprisonment and a $100,000 fine as to Count 1, ninety-seven concurrent months of imprisonment as to each of Counts 2 through 10, sixty concurrent months of imprisonment as to Count 12, and twelve concurrent months of imprisonment as to each of Counts 13 and 14, followed by three years of supervised release as to Counts 1 through 10 and 12, and one concurrent year of supervised release as to Counts 13 and 14.

Blair filed a notice of appeal. In a *per curiam* opinion dated January 30, 2013, the Fourth Circuit affirmed Blair's new sentences. See United States v. Blair, 508 F. App'x 225, 226 (4th Cir. 2013) (per curiam), cert. denied, 571 U.S. 890, rehearing denied, 571 U.S. 1060 (2013). Blair petitioned for a writ of *certiorari*. On October 7, 2013, the Supreme Court denied the petition. See Blair, 571 U.S. 890. Blair petitioned for a rehearing. On November 18, 2013, the Supreme Court denied the petition. See Blair, 571 U.S. 1060.

In the District Court, Blair filed a Motion to Vacate, Set Aside, or Correct Sentence, a Motion for Discovery, a Motion for Witnesses to be Ordered to Appear at Evidentiary Hearing, and a Motion for a 48 Hour Furlough to Appear or to Appear via TV Monitor, which were denied. See Walter Lloyd Blair v. United States, Nos. 8:08-cr-00505-PJM-1,

- 13 -

8:14-cv-00766-PJM, 2016 WL 6569064, at *1, *24-*25 (D. Md. Nov. 4, 2016), appeal dismissed, 688 F. App'x 192 (4th Cir. 2017). Blair filed a Motion to Reduce Sentence, which was also denied. See United States v. Water Lloyd Blair, No. 8:08-cr-00505-PJM-1, 2017 WL 491227, at *2 (D. Md. Feb. 7, 2017).

Blair filed a notice of appeal. In a *per curiam* opinion dated May 3, 2017, the Fourth Circuit dismissed the appeal of the District Court's denials of the Motion to Vacate, Set Aside, or Correct Sentence and related motions. See Blair, 688 F. App'x at 192-93. Blair did not petition for a writ of *certiorari* after the Fourth Circuit dismissed the appeal.

In the Petition for Reinstatement, Blair advised that, on January 11, 2017, he was released from incarceration, and began a required six-month stay at a halfway house. Blair stated that, on or about July 11, 2017, he left the halfway house, and thus was released from federal custody. At that time, Blair began serving a three-year term of supervised release, which, if not reduced, and if served to completion, will end on or about July 11, 2020. At oral argument on May 31, 2018, Blair acknowledged that he was still on supervised release at the time.

**District of Columbia Court of Appeals's Disbarment of Blair**

On February 9, 2001, the District of Columbia Court of Appeals admitted Blair to the Bar of the District of Columbia. See Blair, 40 A.3d at 884. On January 21, 2010—*i.e.*, approximately a month after Blair was convicted on December 15, 2009—Bar Counsel of the District of Columbia reported Blair's convictions to the District of Columbia Court of Appeals. See id. at 885. On March 19, 2010, the District of Columbia Court of Appeals suspended Blair from the practice of law in the District of Columbia. See id. On July 23,

- 14 -

2010, the District of Columbia Board on Professional Responsibility issued a Report and Recommendation in which it determined that witness tampering and obstruction of justice *per se* involved moral turpitude, and recommended disbarment.[4] See Blair, 40 A.3d at 884. The Board stated, however, that the District of Columbia Court of Appeals "should defer final action until an appeal is decided, and [Blair's] convictions are final." Id. at 886 (cleaned up). On February 23, 2012, the District of Columbia Court of Appeals issued a *per curiam* opinion in which it summarily disbarred Blair. See id. at 883-84. The District of Columbia Court of Appeals agreed with the Board that witness tampering was *per se* a crime of moral turpitude. See id. at 884. As far as the Board's Report and Recommendation and the opinion reveal, the Board did not conduct an evidentiary hearing, and the District of Columbia Court of Appeals did not hear oral argument. See id. at 883-87. The District of Columbia Court of Appeals noted that "[t]he events that led to Blair's convictions [were] set forth in detail in" the Fourth Circuit's opinion in Blair, 661 F.3d 755. See Blair, 40 A.3d at 883.

---

[4]D.C. Code § 11-2503(a) provides for automatic disbarment upon a conviction for a crime that involves moral turpitude, stating:

> When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar from practice. Upon reversal of the conviction[,] the court may vacate or modify the suspension. If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and such person shall thereafter cease to be a member. Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order of disbarment.

(Continued...)

## DISCUSSION

## (A) Discretion to Designate a Hearing Judge

Rather than request a hearing, in the Reply to the Motion for Final Disposition or, in the Alternative, Further Proceedings, Blair requested that, if this Court denied the Petition for Reinstatement, the" Court rule that further proceedings be ordered in such form as [we] deem[] appropriate under the circumstances[.]" At oral argument, for the first time, Blair requested a hearing. In response to a question regarding whether he could proffer any evidence of mitigating factors that would be presented at an evidentiary hearing, Blair[5] responded that, after being convicted, he conducted himself "honorably and decently"; "helped other inmates"; "tried to follow the law"; "wrote books"; and "worked with" his counsel. Blair stated that, if this Court ordered an evidentiary hearing on mitigating factors, he would call at least twenty character witnesses, who, he proffered, would testify that he is "a good, decent person."

At oral argument, Blair's counsel stated that, if this Court ordered an evidentiary hearing on mitigating factors, Blair would attempt "to show that the crimes [of] which he was convicted . . . were not an example of intentional dishonest conduct." Blair's counsel explained that, for example, his conviction for making a false statement was based on him stating that he did not remember a matter. Blair's counsel also stated that Blair would offer evidence to establish "all the circumstances that were going on, what was going on in his mind, in his head, at that particular time, and to also present the character of [] Blair—the

---

[5]Although Blair is represented by counsel in this attorney discipline proceeding, at oral argument, Blair made his initial argument, and his counsel made his rebuttal argument.

type of person [who] he is at this time." After being asked whether he could name any mitigating factors that this Court's case law has identified to which Blair's circumstances corresponded, Blair's counsel said he would offer the following:

> [W]hat I do have to offer this Court is that [] Blair is now sixty-seven years old. He has dedicated his life to being an attorney. Right now, he is probably . . . comparatively best at what he has prepared all his life to do. That he's had time in jail to think about the mistakes that he's made. That . . . he's needed in the community. His services are needed. He's prepared to offer those services to those folks who need him the most.

Blair's counsel advised that witnesses would testify as to the purported need for his services.

To resolve the issue of whether an evidentiary hearing is warranted, we must examine Maryland Rules 19-722 (Order Designating Judge and Clerk), 19-727 (Judicial Hearing), and 19-738 (Discipline on Conviction of Crime). Maryland Rule 19-722(a) states: "Upon the filing of a Petition for Disciplinary or Remedial Action, [this] Court [] may enter an order designating [] a judge of any circuit court to hear the action[.]" Maryland Rule 19-727(b)(2) provides that, at an evidentiary hearing, "[t]he attorney may offer, or the [hearing] judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken by the attorney relevant to the allegations of misconduct[.]" Maryland Rule 19-727(d) states that, after an evidentiary hearing, the hearing judge must file a written statement that includes, among other things, "findings as to any aggravating or mitigating circumstances that exist."

While Maryland Rule 19-722 applies to all petitions for disciplinary or remedial action, Maryland Rule 19-738 is specific to petitions for disciplinary or remedial action

- 17 -

that are based on a lawyer's conviction for a serious crime. Maryland Rule 19-738(c)(1)

provides that, "[u]pon receiving and verifying information from any source that an attorney

has been convicted of a serious crime, Bar Counsel may file a Petition for Disciplinary or

Remedial Action[.]" Maryland Rule 19-738(g) governs further proceedings as follows:

> When a petition filed pursuant to section (c) of this Rule alleges the conviction of a serious crime and the attorney denies the conviction, the Court of Appeals may enter an order designating a judge pursuant to Rule 19-722 to hold a hearing in accordance with Rule 19-727.
>
> (1) *No Appeal of Conviction.* If the attorney does not appeal the conviction, the hearing shall be held within a reasonable time after the time for appeal has expired.
>
> (2) *Appeal of Conviction.* If the attorney appeals the conviction, the hearing shall be delayed, except as provided in section (h) of this Rule,[6] until the completion of appellate review.
>
> > (A) If, after completion of appellate review, the conviction is reversed or vacated, the judge to whom the action is assigned shall either dismiss the petition or hear the action on the basis of evidence other than the conviction.
> >
> > (B) If, after the completion of appellate review, the conviction is not reversed or vacated, the hearing shall be held within a reasonable time after the mandate is issued.
>
> (3) *Effect of Incarceration.* If the attorney is incarcerated as a result of the conviction, the hearing shall be delayed until the termination of incarceration unless the attorney requests an earlier hearing and makes all arrangements (including financial arrangements) to attend the hearing or

---

[6]Maryland Rule 19-738(h) sets forth an exception to Maryland Rule 19-738(g)(2) as follows:

> If the hearing on the petition has been delayed under subsection (g)(2) of this Rule and the attorney has been suspended from the practice of law under section (d) of this Rule, the attorney may request that the judge to whom the action is assigned hold an earlier hearing, at which the conviction shall be considered a final judgment.

waives the right to attend.

Maryland Rule 19-738(i) provides for the conclusive effect of a final judgment of conviction, stating:

> In any proceeding under this Chapter, a final judgment of any court of record convicting an attorney of a crime, whether the conviction resulted from acceptance by the court of a plea of guilty or nolo contendere, or a verdict after trial, is conclusive evidence of the attorney's guilt of that crime. As used in this Rule, "final judgment" means a judgment as to which all rights to direct appellate review have been exhausted. The introduction of the judgment does not preclude the Commission or Bar Counsel from introducing additional evidence[,] or the attorney from introducing evidence or otherwise showing cause why no discipline should be imposed.

Plainly, there is no need for a hearing judge to determine whether Blair committed the serious crimes in question, as he has not denied his convictions—to the contrary, he has unequivocally admitted them. In the Petition for Reinstatement, Blair noted that he was convicted of all fourteen counts of the Superseding Indictment, and that the Fourth Circuit had affirmed thirteen convictions and reversed one. At oral argument, Blair stated: "I accept, and I admit, [that] I am convicted of these crimes." Additionally, Blair's counsel agreed with the Court that Blair does not deny his convictions, and instead that Blair simply disputes the events that underlay his convictions.

This attorney discipline proceeding is not a proper venue for Blair to contest his guilt. "The integrity of a [] conviction cannot be attacked in a disciplinary proceeding by invoking this Court to reweigh or to re-evaluate the [attorney]'s guilt or innocence." Attorney Grievance Comm'n v. Sweitzer, 452 Md. 26, 40, 156 A.3d 134, 142 (2017), reconsideration denied (Apr. 21, 2017) (cleaned up). Given that Blair has exhausted "all rights to direct appellate review" of the convictions that the Fourth Circuit affirmed, the

same constitute "conclusive evidence of [his] guilt of" those crimes.  Md. R. 19-738(i).

## (B) Conclusions of Law

It has been conclusively established that Blair engaged in several instances of dishonest, criminal conduct when he "concocted and executed a scheme to launder drug proceeds that he obtained from a client."  Blair, 661 F.3d at 759.  The Fourth Circuit affirmed Blair's convictions for the following thirteen offenses:

(1) money laundering, based on Simpson, Blair's soon-to-be client, giving him a duffel bag with approximately $170,000 in drug money that, as he was fully aware, she had obtained from a safe that belonged to Rankine, a marijuana distributor, see id. at 759-60;

(2) money laundering, based on Blair giving Clarke, a real estate broker, $9,000 of the drug money so that he could buy real estate on Simpson's behalf, see id. at 761;

(3) money laundering, based on Blair depositing $6,000 of the drug money into the business checking account of Jay Paul Property Management, the real estate corporation that his firm had created on Simpson's behalf, see id. at 761-62;

(4) money laundering, based on Blair giving Clarke $31,000 of the drug money so that he could buy real estate on Simpson's behalf, see id. at 762;

(5) money laundering, based on Simpson using $2,000 of the drug money to pay a deposit on a house in Washington, D.C., see id.;

(6) money laundering, based on Simpson using $5,000 of the drug money to pay a deposit on a tract of land in Maryland, see id.;

(7) money laundering, based on Blair using $6,000 of the drug money to buy a bank

check that was payable to another lawyer;

(8) money laundering, based on Simpson using $12,432 of the drug money to pay the amount that was due at closing for the purchase of the house in Washington, D.C., see id.;

(9) money laundering, based on Blair using $20,000 of the drug money to pay Boone and Yoffy to represent Saunders and Bernard, respectively, who were Rankine's associates who had been charged with conspiracy to distribute drugs, see id. at 761, 763 & n.2;

(10) witness tampering, based on Blair telling Simpson not to tell the FBI agents about the drug money, and that, if the drug money came up, she should falsely state that it was "partner money," see id. at 762;

(11) making a false statement, based on, during an interview with IRS agents, Blair providing false information about the nature, source, and amount of the drug money;

(12) willful failure to file a federal income tax return for 2002, see id. at 768; and

(13) willful failure to file a federal income tax return for 2003, see id.

Every one of these thirteen crimes is a felony, except for willful failure to file a federal income tax return, which is a misdemeanor. See 18 U.S.C. §§ 1956(a)(1)(B)(i) (Money Laundering), 1957(a) (same), 1512 (Witness Tampering), 1001(a)(2) (Making False Statement); 26 U.S.C. § 7203 (Willful Failure to File Federal Income Tax Return).

Every one of these thirteen crimes constitutes "a criminal act that reflects adversely on [Blair's] honesty, trustworthiness or fitness as a lawyer in other respects[.]" MLRPC 8.4(b). Every one of these thirteen crimes constitutes "conduct involving dishonesty, fraud, deceit[,] or misrepresentation[.]" MLRPC 8.4(c). And every one of these thirteen crimes

constitutes "conduct that is prejudicial to the administration of justice[.]" MLRPC 8.4(d). We conclude that Blair has violated MLRPC 8.4(b), 8.4(c), and 8.4(d).

## (C) Mitigating Factors and Sanction

Maryland Rule 19-738(i) contemplates that, where a final judgment of conviction establishes that an attorney committed the serious crime in question, the attorney may introduce evidence or otherwise show cause why discipline should not be imposed. A careful review of our attorney discipline jurisprudence and this attorney discipline proceeding's unique circumstances makes clear that there is no reasonable basis on which to exercise our discretion to designate a hearing judge for the purpose of determining whether there are any mitigating factors.

To begin, the case for disbarment is overwhelming. "[G]enerally, disbarment is the appropriate sanction for a lawyer's misconduct where the lawyer commits a crime that establishes that the lawyer is unfit to continue to practice law." Attorney Grievance Comm'n v. Greenleaf, 438 Md. 151, 170, 91 A.3d 1066, 1077 (2014) (cleaned up). For example, this Court has disbarred: a lawyer who solicited for sexual acts a person whom he believed to be under the age of consent, see id. at 167, 91 A.3d at 1075; a lawyer who obstructed and hindered a law enforcement officer by helping a murder suspect flee the country, see Attorney Grievance Comm'n v. Sheinbein, 372 Md. 224, 249-50, 812 A.2d 981, 995-96 (2002); a lawyer who illegally transported a handgun and committed battery when he abused his spouse and child, see Attorney Grievance Comm'n v. Painter, 356 Md. 293, 307, 305, 739 A.2d 24, 32, 31 (1999); a lawyer who possessed marijuana with the intent to distribute, see Attorney Grievance Comm'n v. Dechowitz, 358 Md. 184, 193, 186,

747 A.2d 657, 661, 658 (2000); a lawyer who committed misprision of a felony,[7] see Attorney Grievance Comm'n v. Wingerter, 400 Md. 214, 217, 236, 929 A.2d 47, 49, 60 (2007); a lawyer who committed conspiracy to commit immigration fraud, Attorney Grievance Comm'n v. Garcia, 410 Md. 507, 529, 509-10, 979 A.2d 146, 159, 147 (2009); and a lawyer who violated the Sherman Antitrust Act, see Attorney Grievance Comm'n v. Nusbaum, 436 Md. 609, 617, 613, 84 A.3d 98, 103, 101 (2014). Unlike the lawyers in these cases, Blair did not commit only one or two crimes; he committed thirteen. Additionally, of particular significance here, this Court has disbarred "attorneys who have committed tax-related violations with fraudulent intent." Attorney Grievance Comm'n v. Worsham, 441 Md. 105, 133, 105 A.3d 515, 531 (2014) (cleaned up).

Moreover, "[a]bsent compelling extenuating circumstances, disbarment is ordinarily the sanction for intentional dishonest conduct." Attorney Grievance Comm'n v. Slate, 457 Md. 610, 650, 180 A.3d 134, 158 (2018) (cleaned up). This Court announced this principle in Attorney Grievance Comm'n v. Vanderlinde, 364 Md. 376, 418, 773 A.2d 463, 488 (2001), stating:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials[,] or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character. Disbarment ordinarily should be the sanction for intentional dishonest

---

[7]Misprision of a felony occurs where someone "having knowledge of the actual commission of a felony [that is] cognizable by a court of the United States[] conceals[,] and does not as soon as possible make known[,] the same to some judge or other person in civil or military authority under the United States[.]" 18 U.S.C. § 4.

conduct.

(Paragraph break omitted). The principle that this Court announced in Vanderlinde remains good law. Recently, in Attorney Grievance Comm'n v. Smith, 457 Md. 159, 223, 227, 177 A.3d 640, 678, 680 (2018), where a lawyer engaged in misrepresentations and misappropriations, this Court quoted the above language in Vanderlinde, and, in the absence of any mitigating factors—much less compelling extenuating circumstances—this Court disbarred the lawyer "to follow our principle established in" Vanderlinde.

Although intentional dishonest conduct ordinarily results in disbarment, this Court considers the circumstances of each attorney discipline proceeding to determine the appropriate sanction. See Attorney Grievance Comm'n v. Lane, 367 Md. 633, 646, 790 A.2d 621, 628 (2002) (This Court discussed Vanderlinde, then stated that, "in attorney grievance proceedings[,] we must examine the facts, circumstances, and mitigation [that are] involved in each case[,] and not take a procrustean approach."); Attorney Grievance Comm'n v. Brigerman, 441 Md. 23, 42-43, 105 A.3d 467, 478 (2014) ("*Vanderlinde* is not a 'bright-line rule,' and 'we must still examine the facts, circumstances, and mitigation in each case' to determine the appropriate sanction." (Quoting Lane, 367 Md. at 647, 790 A.2d at 628-29)). "[W]here the misconduct involves intentional dishonest conduct, but not misappropriation, the *Vanderlinde* bright-line admonition has not always been applied." Attorney Grievance Comm'n v. Stillwell, 434 Md. 69, 84, 73 A.3d 243, 251 (2013) (cleaned up). That said, this Court has consistently held that "misappropriation of funds by an attorney is an act [that is] infected with deceit and dishonesty[,] and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a

- 24 -

lesser sanction." Attorney Grievance Comm'n v. Gray, 444 Md. 227, 262, 118 A.3d 995, 1014 (2015) (cleaned up).

In Vanderlinde, 364 Md. at 413-14, 773 A.2d at 485, this Court defined "compelling extenuating circumstances" as follows:

> [I]n cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct[,] and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct[,] *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the M[L]RPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds[,] or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

(Emphasis in original).

Here, in light of the dishonest and criminal nature of Blair's misconduct, the number of instances of misconduct, and the egregiousness of the conduct, compelling extenuating circumstances would be necessary to preclude disbarment. See Worsham, 441 Md. at 135, 105 A.3d at 533 ("[I]n cases of intentional dishonesty, misappropriation, fraud, criminal conduct[,] and the like, only the most compelling extenuating circumstances warrant a sanction less than disbarment[.]" (Citing Vanderlinde, 364 Md. at 388, 773 A.2d at 470)).

There is no indication of the existence of any evidence in this attorney discipline proceeding that would come close to establishing compelling extenuating circumstances, and evidence of the mitigating factors suggested by Blair and his attorney is insufficient to prevent the sanction of disbarment. At oral argument, in response to questions about the possibility of establishing mitigating factors, Blair and his counsel identified certain

- 25 -

circumstances that, if proven, would not even constitute mitigating factors, such as Blair's age and the purported need for his services. For reference, this Court has identified the following mitigating factors:

> (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to Bar Counsel or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the MLRPC; and (14) unlikelihood of repetition of the misconduct.

Attorney Grievance Comm'n v. Allenbaugh, 450 Md. 250, 277-78, 148 A.3d 300, 316-17 (2016) (cleaned up).[8]

Next, although Blair has not expressly alleged delay in the attorney discipline proceeding as a mitigating factor, we note that the circumstances of the case do not establish that Blair's misconduct is mitigated by this factor. Bar Counsel initiated this attorney discipline proceeding by filing the Petition for Disciplinary or Remedial Action on May 3, 2010, within five months after Blair was convicted on December 15, 2009. There was no unreasonable delay on Bar Counsel's part in initiating this attorney discipline

---

[8]Most of the mitigating factors that this Court's case law has identified are derived from Standard 9.32 of the American Bar Association's Standards for Imposing Lawyer Sanctions.

proceeding. To be sure, approximately seven-and-a-half years passed between the May 3, 2010 filing of the Petition for Disciplinary or Remedial Action and the January 30, 2018 filing of the Motion for Final Disposition or, in the Alternative, Further Proceedings. But, the time lapse is attributable to Blair's failure to comply with his obligations to report the outcome of his appeal. Blair was required to promptly notify Bar Counsel of the Fourth Circuit's opinion disposing of the first appeal in his criminal case, but failed to do so. When the Fourth Circuit issued its opinion in 2011, former Maryland Rule 16-771 governed discipline of lawyers who had been convicted. Former Maryland Rule 16-771(a) stated: "An attorney charged with a serious crime in this State or any other jurisdiction shall promptly inform Bar Counsel in writing of the criminal charge. Thereafter, **the attorney shall promptly notify Bar Counsel of the final disposition of the charge in each court that exercises jurisdiction over the charge.**" (Emphasis added).

Blair did not inform Bar Counsel of the Fourth Circuit's opinion for more than six years, *i.e.*, until after he was released from federal custody. On December 1, 2017, after he had been released from custody, Blair filed the Petition for Reinstatement, in which he advised Bar Counsel for the first time that the Fourth Circuit had affirmed thirteen of his convictions. Within two months of Blair's notification, on January 30, 2018, Bar Counsel filed the Motion for Final Disposition or, in the Alternative, Further Proceedings, recommending disbarment.

At oral argument, Deputy Bar Counsel stated that, generally, the Office of Bar Counsel attempts to track the status of a lawyer's criminal case, and acknowledged that such tracking apparently did not occur here. To the extent that the Office of Bar Counsel

attempts to track the status of a lawyer's criminal case, this does not relieve a lawyer of the obligation under the Maryland Rules to report the disposition of a criminal case. To the contrary, former Maryland Rule 16-771(a) and current Maryland Rule 19-738(b) obligate a lawyer to promptly advise Bar Counsel of certain events in his or her criminal case.[9] Thus, any delay in this attorney discipline proceeding's disposition is attributable to Blair, and does not mitigate his misconduct.

In addition, the potential that remorse may be a mitigating factor does not warrant ordering an evidentiary hearing, or dissuade us from the conclusion that disbarment is the appropriate sanction. In the Renewed Petition for Reinstatement and Response to the Attorney Grievance Commission's Recommendation for Sanction, Blair apologized "for any wrong judgment he made" that led to his criminal case. At oral argument, Blair stated: "I'm here to apologize for any wrong"; and "I accept responsibility for this." In the Petition for Reinstatement, Blair states that his crimes "were not motivated by ill[ ]will to anyone[] or greed, and he did not cause harm to anyone[,] as there [were] no victims in his [criminal] case." Given that Blair took some of the drug money for himself, and willfully failed to file federal income tax returns for two years while laundering the drug money during one of those years, the allegation that he was not motivated by greed is dubious. Although the

---

[9]Former Maryland Rule 16-771(a)'s successor, current Maryland Rule 19-738(b), states:

> An attorney charged with a serious crime in this State or any other jurisdiction shall promptly inform Bar Counsel in writing of (1) the filing of the charge, (2) any finding or verdict of guilty on such charge, and (3) the entry of a judgment of conviction on such charge.

sincerity of one's remorse admittedly may be difficult to assess, nothing in Blair's filings, or his or his counsel's statements at oral argument, rises to the level of establishing compelling extenuating circumstances or mitigating factors that warrant a sanction other than disbarment. There is no reason to order a hearing to develop evidence concerning remorse, as Blair's expressions of remorse are already documented in the record. In light of the number of convictions, the extreme dishonest nature of his conduct, and our case law concerning the sanction for dishonesty and criminal conduct, the existence of remorse does not persuade us that a sanction less than disbarment is warranted.

We are aware that certain circumstances that Blair has alleged may correspond to the mitigating factor of character or reputation. In the Petition for Reinstatement, Blair stated that there are "attorneys, doctors, and [other] citizens" who "have seen [] Blair's earnest efforts to earn back . . . his good reputation in the community." And, at oral argument, Blair proffered that those individuals would testify that he is "a good, decent person." Assuming, for argument's sake, that Blair would be able to establish at an evidentiary hearing the mitigating factor of good character or reputation, this factor, like remorse, does not come close to constituting compelling extenuating circumstances or mitigating circumstances that negate disbarment as the appropriate sanction in this case.

In Allenbaugh, 450 Md. at 277, 148 A.3d at 316, this Court stated:

> This Court sanctions a lawyer not to punish the lawyer, but instead to protect the public and the public's confidence in the legal profession. This Court accomplishes these goals by: (1) deterring other lawyers from engaging in similar misconduct; and (2) suspending or disbarring a lawyer who is unfit to continue to practice law.
>
> In determining an appropriate sanction for a lawyer's misconduct, this

Court considers: (1) the MLRPC that the lawyer violated; (2) the lawyer's mental state; (3) the injury that the lawyer's misconduct caused or could have caused; and (4) aggravating factors and/or mitigating factors.

(Cleaned up).

Blair's convictions demonstrate that he violated MLRPC 8.4(b) (Criminal Act), 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation), and 8.4(d) (Conduct That Is Prejudicial to the Administration of Justice) by committing the crimes of money laundering, witness tampering, making a false statement, and willful failure to file federal income tax returns. As to Blair's mental state, all of the crimes that Blair committed involve knowing and/or intentional dishonesty.

Blair's crimes injured the public in multiple ways. Blair's money laundering was an attempt to legitimize drug money; plainly, drug trafficking is a crime that is injurious to the community. Blair's witness tampering and making of a false statement constituted attempts to prevent FBI agents and IRS agents from learning material information about criminal conduct. Blair's willful failure to file federal income tax returns potentially deprived the federal government of revenue and coincided with the time period in which he engaged in laundering drug money, and took drug money for himself.[10]

The appropriate sanction for Blair's crimes is disbarment. Alone, any one of the eleven felonies that Blair committed—nine instances of laundering drug money, one instance of witness tampering, and one instance of making a false statement—would

---

[10]The circumstances of Blair's misconduct are consistent with the existence of numerous aggravating factors, such as substantial experience in the practice of law, multiple violations of the MLRPC, a pattern of misconduct, and a selfish or dishonest motive.

- 30 -

heavily weigh in favor of disbarment.  See Greenleaf, 438 Md. at 170, 91 A.3d at 1077

("[G]enerally, disbarment is the appropriate sanction for a lawyer's misconduct where the

lawyer commits a crime that establishes that the lawyer is unfit to continue to practice law."

(Cleaned up)).  Making matters worse, each of the eleven felonies that Blair committed

involves knowing and/or intentional dishonesty—which, in and of itself, heavily weighs in

favor of disbarment.  See Slate, 457 Md. at 650, 180 A.3d at 158 ("Absent compelling

extenuating circumstances, disbarment is ordinarily the sanction for intentional dishonest

conduct."  (Cleaned up)).  Blair also willfully failed to file federal income tax returns for

two years, including the year in which he took drug money for his own use.  See Worsham,

441 Md. at 133, 105 A.3d at 531 (This Court has disbarred "attorneys who have committed

tax-related violations with fraudulent intent."  (Cleaned up)).  The sheer volume and

egregious nature of Blair's dishonest, criminal conduct is such that neither a determination

of remorse or good character or reputation as a mitigating factor warrants the imposition

of a sanction less than disbarment.  Blair's thirteen convictions make clear that disbarment

is necessary to protect the public and to deter other lawyers from embarking on criminal

enterprises similar to the one that Blair so brazenly executed.[11]

---

[11]In addition to having served a lengthy term of imprisonment for crimes involving dishonest conduct, Blair is currently serving a three-year term of supervised release. As such, Blair has not completed his federal sentence.  If Blair is found to have violated a condition of supervised release, he would be subject to additional imprisonment. See 18 U.S.C. § 3583(e)(3).  As such, although Blair is no longer in federal custody, he is not living unsupervised in the community.  It would, at a minimum, be inconsistent to determine that Blair may be entrusted to handle the legal affairs of others, while, at the same time, being deemed not able to live unsupervised in the community.
(Continued...)

For the above reasons, we disbar Blair.[12]

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST WALTER LLOYD BLAIR.**

---

[12]As a result of this Court's decision to disbar Blair, the Petition for Reinstatement is, of course, denied. A separate Order is issued by this Court denying the same.

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 83
SEPTEMBER TERM, 2009

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

WALTER LLOYD BLAIR

Greene
Adkins
Watts
Getty
Harrell, Glenn T., Jr.,
    (Senior Judge, Specially Assigned)
Battaglia, Lynne A.
    (Senior Judge, Specially Assigned)
Raker, Irma S.
    (Senior Judge, Specially Assigned)

JJ.

Concurring and Dissenting Opinion by Harrell,
J., which Adkins and Raker, JJ., join.

Filed: July 13, 2018

I dissent, although with the utmost respect for some of the views, reasons, and outcomes expressed in the Majority opinion. For example, I concur that Respondent's Petition for Reinstatement (Misc. Docket AG No. 44) should be denied, if for no other reasons than Blair's failure to comply with the information – sharing requirements of Md. Rule 19-751(c) and (d).[1] That being said, I disagree with the Majority opinion's rush-to-judgment in disbarring Blair, at least at this point in the proceedings under Misc. Docket AG No. 83. I submit that additional fact-finding may be required before a final sanction is imposed. I would remand No. 83 to a judge of the Circuit Court for Prince George's County[2] for an evidentiary hearing limited to the accepted factors of sanction mitigation (as identified in the Majority opinion at 25) for why, if at all, the sanction appropriate for Blair's misconduct should be less than disbarment.[3] The judge hearing this matter should make credibility assessments of any witnesses marshalled by Blair and render written findings of fact (and, as may be appropriate, conclusions as to the legal relevance of any evidence offered on any proper mitigation factor).

---

[1] As Deputy Bar Counsel enumerated at oral argument, Respondent, neither in his Petition for Reinstatement nor any supplemental filings made through the day of oral argument, supplied: (1) an address, email address, or phone number, (2) copies of his tax returns dating back to three years preceding his interim suspension, (3) information about the status of any amounts still owed from 2002-2003, the two years for which he was convicted of failing to file tax returns; and, (4) other financial information as required by Md. Rule 19-752(d)(D)(I).

[2] Based on a statement made by Blair at oral argument regarding a conversation he had allegedly with Judge Leo E. Green, Jr. of that court, Judge Green should be excused from the pool of judges eligible to be assigned to hear this matter on remand.

[3] Blair conceded at oral argument that his misconduct, on its face, warrants disbarment.

I conclude that, because it appears that Blair has not had an opportunity to present evidence of mitigation to a judicial officer or tribunal of any ilk across the disciplinary bodies who have sanctioned him for his misconduct, he should be given that opportunity here.[4,5] I would not deny Blair this opportunity merely because he and his counsel appeared to be unprepared at oral argument to articulate a more specific proffer of what relevant mitigation evidence they might seek to offer at an evidentiary hearing. Their lack of preparation was understandable because they were not on notice before oral argument that that area of inquiry was likely to arise, given the delay in the proceedings under Misc. AG No 83. As the Majority opinion notes (at Maj. slip op. 16), the notion of remanding for a hearing did not arise until oral argument.[6] Had a remand received a fourth vote from this Court, I would have continued Blair's suspension at least until the Court considered the hearing judge's findings and conclusions, any exceptions thereto, and further oral argument.

---

[4] As the Majority opinion notes, Blair's disbarment by the District of Columbia Court of Appeals was a summary proceeding. Maj. slip op. at 4, 15.

[5] Md. Rule 19-738(i) contemplates that such a hearing is within this Court's discretion, even after the underlying criminal conviction or convictions became final. The rule provides, in relevant part, that: "The introduction of the judgment [of criminal conviction] does not preclude the . . . attorney from introducing evidence or otherwise showing cause why no discipline should be imposed." In the circumstances of the present case, i.e., Blair acknowledges that disbarment is warranted on the face of his misconduct, it seems unlikely that "no discipline" is an unattainable objective. Accordingly, a more realistic objective for which to aim might be merely a lesser sanction than disbarment.

[6] The Majority opinion's substitute for a proper evidentiary hearing and findings as to mitigation factors is to assume and analyze whether it agrees with (or would find sufficient) the hip-shooting comments made by Blair and his counsel at oral argument. Maj. slip op. at 26-31. This is an unacceptable procedure. Even then, the Majority opinion recognizes that some of what they alluded to could be legitimate mitigation considerations, i.e., remorse, *id.* at 28, and character/reputation, *id.* at 29.

Judges Adkins and Raker authorize me to state that they join in the views expressed in this Dissent.